774 F.2d 1414
 23 ERC 1933, 16 Envtl. L. Rep. 20,562
 PEOPLE OF the VILLAGE OF GAMBELL, People of the Village of
Stebbins, and Nunam Kitlutsisti, Plaintiffs-Appellants,
v.
Donald P. HODEL, Secretary of the Interior, and U.S.
Department of the Interior, Defendants-Appellees,
Arco Alaska, Inc., Amoco Production Company, et al.,
Defendants-Intervenors-Appellees.
 No. 85-3877.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Sept. 4, 1985.
Decided Oct. 25, 1985.
 
 Donald S. Cooper, James A. Bamberger, Heather H. Grahame, Alaska Legal Services Corp., Anchorage, Alaska, for plaintiffs-appellants.
 Carl J.D. Bauman, Hughes, Thorsness, Powell & Brundin, Anchorage, Alaska, F. Henry Habicht, II, Asst. Atty. Gen., Michael W. Reed, Bruce M. Landon, Jacques B. Gelin, David C. Shilton, Dept. of Justice, Washington, D.C., for defendants-appellees.
 Brice M. Clagett, E. Edward Bruce, Bobby R. Burchfield, Covington & Burling, Washington, D.C., for Arco Alaska, Inc., et al.
 Appeal from the United States District Court for the District of Alaska.
 Before PREGERSON and ALARCON, Circuit Judges, and DIMMICK, District Judge*.
 ALARCON, Circuit Judge:
 
 
 1
 The People of the Village of Gambell, et al. (hereinafter the Villages),[1] appeal from an order of the district court of Alaska denying consolidated motions for a preliminary injunction. The requested injunction would prohibit exploration for oil and gas on two tracts leased to appellees/intervenors, Arco Alaska, Inc. and Amoco Production Co., et al. (hereinafter the Oil Companies), by the United States Department of the Interior on federally owned lands in the outer continental shelf of Alaska.
 
 
 2
 We must determine whether the district court abused its discretion in failing to issue a preliminary injunction notwithstanding its determination that the Villages had a "strong likelihood of success on the merits" in light of the presumption of harm flowing from a violation of a statute and the facts in the record showing the possibility of a significant restriction of subsistence use. We conclude that the district court abused its discretion in denying a preliminary injunction because it failed to give proper weight to Congress's expressly stated policy of protecting the subsistence needs and culture of Native Alaskans against the harm which may result from the lease of public lands in the outer continental shelf.PERTINENT FACTS
 
 
 3
 This matter is again before this court following our decision in People of the Village of Gambell v. Clark, 746 F.2d 572 (9th Cir.1984) (hereinafter Gambell I ). In Gambell I, the People of the Village of Gambell and the People of the Village of Stebbins brought an action in the district court to enjoin the sale of leases located in federally owned outer continental shelf land in Lease Sale 57. The Secretary of the Interior (hereinafter the Secretary) had offered to sell the leases for oil and gas exploration pursuant to the Outer Continental Shelf Lands Act, 43 U.S.C. Secs. 1331-1356 (as amended 1980) (hereinafter the Lands Act). Bids were submitted by the oil companies. Lease Sale 57 consists of approximately 2.4 million acres in the Norton Sound Basin twenty-five miles off the western shore of Alaska.
 
 
 4
 In Gambell I the Villages presented two arguments to the district court in support of their request for an injunction. First, the Villages contended that the sale of leases for oil and gas exploration would interfere with their aboriginal hunting and fishing rights. Second, they asserted that the Secretary failed to evaluate the impact of such laws on the subsistence culture of Native Alaskans as required by section 810 of the Alaska National Interest Lands Conservation Act, 16 U.S.C. Secs. 3101-3233 (1980) (hereinafter the Conservation Act) prior to conducting the sales. The district court denied the Villages' motion for a preliminary injunction and granted the Secretary's motion for summary judgment. The district court held that the Villages' aboriginal hunting and fishing rights and their rights protected under section 810 of the Conservation Act did not extend to the outer continental shelf outside the territorial boundaries of Alaska.
 
 
 5
 In his briefs before this court in Gambell I, the Secretary argued that if this court " '[s]hould ... find it appropriate to order the Secretary to carry out the procedures of section 810, there is no need to undo what has already been done. The proper role for the court is to simply maintain the status quo while the Secretary does whatever is necessary to comply.' " (Appellants' Reply Brief at 4, quoting Brief for Federal Appellees (Gambell I ), at 49). The oil companies made a similar but more specific recommendation in their brief in Gambell I. " 'If this court should hold that Sec. 810 of ANILCA applies to the OCS [outer continental shelf], the appropriate remedy would be ... to enjoin further activities until the Secretary completes the procedures required by the statute, if irreparable harm is shown, see Weinberger v. Romero-Barcelo, 456 U.S. 305 [102 S.Ct. 1798, 72 L.Ed.2d 91] (1982).' " (Appellants' Reply Brief at 4, quoting Brief of Appellee Arco Alaska, Inc. (Gambell I ), at 49).
 
 
 6
 We held in Gambell I that the Villages' claims to an aboriginal right to hunt and fish in Norton Sound and in the waters in the outer continental shelf were extinguished by the Alaska Native Claims Settlement Act (hereinafter Claims Settlement Act), 43 U.S.C. Secs. 1601-1628 (1971), but that in section 810 of Title VIII of the Conservation Act, Congress provided protection for subsistence uses of the fish and wildlife in the waters and ice over the outer continental shelf by requiring the Secretary to evaluate the effect of a lease sale on subsistence use. Gambell I, 746 F.2d at 579-82. In reversing the district court's orders in Gambell I, we gave the following direction to the district court:
 
 
 7
 Appellants ask that the lease sale be voided because the Secretary has not complied with the requirements of section 810. Appellees contend that the Secretary has substantially complied with the requirements of the section, albeit acting under other statutes, and if he has not, the proper remedy is to maintain the status quo unless and until the Secretary complies with section 810, citing California v. Watt, 683 F.2d 1253, 1266 (9th Cir.1982), reversed on other grounds, 464 U.S. 312, 104 S.Ct. 656, 78 L.Ed.2d 496 (1984).
 
 
 8
 These arguments raise factual and legal issues that have not been but should be considered initially by the district court.
 
 
 9
 Gambell I, 746 F.2d at 582-83.
 
 
 10
 Gambell I was argued before this court on October 7, 1983. On April 17, 1984, while the matter concerning Lease Sale 57 was still under submission to this court, the Secretary held a sale of leases on Lease Sale 83 in the outer continental shelf lands in the Navarin Basin off the shore of Alaska. This court filed its opinion in Gambell I on November 2, 1984. Due primarily to delays requested by the Secretary, the decision in Gambell I did not become final until mandate issued on March 2, 1985.
 
 
 11
 On April 3, 1985, the People of the Villages of Gambell and Stebbins brought a motion for preliminary injunction to halt exploratory activities on Lease Sale 57.
 
 
 12
 On April 25, 1985, the People of the Village of Gambell and the intertribal organization of Nunam Kitlutsisti filed a separate action to enjoin future exploratory activities on Lease Sale 83 and to rescind the authority previously granted to the Oil Companies in that portion of the outer continental shelf. Lease Sale 83 consists of approximately 37 million acres and is located in the water of the Bering Sea in the outer continental shelf due west of St. Mathews Island, approximately 250 miles from the mainland of Alaska.
 
 
 13
 This separate complaint was based on precisely the same grounds alleged in the prior action (Gambell I ) concerning Lease Sale 57: i.e., that the Secretary failed to comply with section 810 of the Conservation Act prior to authorizing exploratory activities in the waters over the outer continental shelf. The district court consolidated these matters for the hearing on the Villages' motion for a preliminary injunction.
 
 
 14
 The district court applied the "traditional" test for determining whether injunctive relief is warranted, and denied the request for a preliminary injunction. The district court first explained that the Secretary did not comply with the requirements of section 810 of the Conservation Act because he failed to evaluate the subsistence impacts of the leases with the mandate of that law clearly in mind. After finding that "delay in the exploration of the OCS [outer continental shelf] may cause irreparable harm to this nation's quest for new oil resources and energy independence," the court nonetheless concluded:
 
 
 15
 (1) Movants have established a strong likelihood of success on the merits.
 
 
 16
 (2) The balance of irreparable harm does not favor the movants.
 
 
 17
 (3) The public interest favors continued oil exploration, for the reason that the national interest favors OCS [outer continental shelf] oil exploration and such exploration will not cause the type of harm, a restriction in subsistence uses or resources, that ANILCA was designed to prevent.
 
 
 18
 On May 30, 1985, the district court issued a minute order sua sponte stating that:
 
 
 19
 The court has been informed that its denial of plaintiffs' motion for preliminary injunction will be appealed to the Ninth Circuit. In order to expedite the appeal, and for the reasons stated in this court's earlier order, the court indicates that it will not entertain a motion for stay pending appeal.
 
 
 20
 On June 6, 1985, a motions panel of this court issued an order denying the Villages' emergency motion for an injunction pending appeal. The Secretary and the Oil Companies were ordered to file, within seven days, a hold harmless agreement "that will protect appellants from any consequences resulting from significant restrictions upon subsistence uses by appellants of their lands." The motions panel retained jurisdiction of this matter for "the purpose of reimposing a temporary stay should the panel disapprove the form and substance of the hold harmless agreement." The hold harmless agreement was approved by the motions panel on June 21, 1985.
 
 DISCUSSION
 
 21
 Our review of a motion for a preliminary injunction is "very limited." Apple Computer, Inc. v. Formula International, Inc., 725 F.2d 521, 523 (9th Cir.1984). "The decision to grant or deny is within the discretion of the trial court and will only be reversed if that discretion has been abused or if the decision is based on erroneous legal standards or clearly erroneous findings of fact." Oakland Tribune, Inc. v. Chronicle Publishing Co., 762 F.2d 1374, 1376 (9th Cir.1985).
 
 A. Applicability of the Traditional Test
 
 22
 This court has recognized two sets of standards for evaluating a claim for injunctive relief. We refer to one as the "traditional" test and the other as the "alternative" test. American Motorcyclist Ass'n v. Watt, 714 F.2d 962, 965 (9th Cir.1983). In American Motorcyclist Ass'n we described the traditional test as follows: "The traditional equitable criteria for determining whether an injunction should issue are (1) Have the movants established a strong likelihood of success on the merits; (2) does the balance of irreparable harm favor the movants; (3) does the public interest favor granting the injunction?" Id. at 965.
 
 
 23
 "The 'alternative' test permits the moving party to meet its burden by demonstrating either a combination of probable success and the possibility of irreparable injury or that serious questions are raised and the balance of hardships tips sharply in its favor." Id. (citing Benda v. Grand Lodge of IAM, 584 F.2d 308, 314-15 (9th Cir.1978), cert. dismissed, 441 U.S. 937, 99 S.Ct. 2065, 60 L.Ed.2d 667 (1979); William Inglis & Sons Baking Co. v. ITT Continental Baking Co., 526 F.2d 86, 88 (9th Cir.1975)).
 
 
 24
 We have concluded, however, that the traditional and the alternative tests are "not really two entirely separate tests, but that they are merely extremes of a single continuum." Benda v. Grand Lodge of IAM, 584 F.2d at 315. Accord, Regents of University of California v. ABC, 747 F.2d 511, 515 (9th Cir.1984); Los Angeles Memorial Coliseum Comm'n v. National Football League, 634 F.2d 1197, 1200 (9th Cir.1980). We have also noted that "[t]he difference between the two formulations is insignificant. Therefore, we accept either as satisfactory." Benda, 584 F.2d at 315. Because the district court employed only the traditional test, we will review the findings under that formulation. See Regents of University of California v. ABC, 747 F.2d at 515-16 n. 4 (where the district court made a finding that the public interest favored the issuance of the preliminary injunction, this court reviewed the district court's findings under the traditional standard).
 
 B. Likelihood of Success on the Merits
 
 25
 The Villages argue that the district court properly determined that they had established "a strong likelihood of success on the merits" on their claim that the Secretary could not have substantially complied with the provisions of the Conservation Act because he did not have its mandates "clearly in mind." The district court correctly concluded that an administrative decision compelled by a land preservation statute must be made with the requirements imposed by Congress clearly in mind. See Stop H-3 Ass'n v. Coleman, 533 F.2d 434, 445 (9th Cir.) ("a court reviewing the Secretary's 4(f) decision must satisfy itself that the Secretary evaluated the highway project with the mandates of section 4(f) clearly in mind" ), cert. denied, 429 U.S. 999, 97 S.Ct. 526, 50 L.Ed.2d 610 (1976). Accord, Adler v. Lewis, 675 F.2d 1085, 1092 (9th Cir.1982).
 
 
 26
 Prior to Lease Sale 57 and Lease Sale 83, the Secretary did not have the requirements of Congress in mind because it was his contention that section 810 of the Conservation Act did not apply to land beneath the water of the outer continental shelf off the coast of Alaska. Section 810(a) of the Conservation Act provides in pertinent part as follows:
 
 
 27
 In determining whether to ... lease, or otherwise permit the use, occupancy, or disposition of public lands under any provision of law authorizing such actions, the head of the Federal agency having primary jurisdiction over such lands or his designee shall evaluate the effect of such use, occupancy, or disposition on subsistence uses and needs, the availability of other lands for the purposes sought to be achieved, and other alternatives which would reduce or eliminate the use, occupancy, or disposition of public lands needed for subsistence purposes.
 
 
 28
 16 U.S.C. Sec. 3120(a) (1982) (emphasis added). Therefore, in determining whether to approve Lease Sale 57 or Lease Sale 83, the Secretary did not evaluate the effect of such leases on subsistence uses and needs of the Native Alaskans who are part of the Villages.
 
 
 29
 We agree with the district court's determination that the Secretary failed to comply with the mandatory requirements of section 810(a). In Kunaknana v. Clark, 742 F.2d 1145 (9th Cir.1984), we said that section 810(a) "requires the agency to evaluate the effects upon subsistence needs of leasing the particular tracts tentatively selected...." Id. at 1151. After Gambell I, it is clear that section 810(a) does apply to public lands in the outer continental shelf.
 
 
 30
 The Secretary contends, however, that his compliance with the requirements of the National Environmental Policy Act, 42 U.S.C. Sec. 4321-4337 (1976) (hereinafter the Environmental Act or NEPA) and the Lands Act is sufficient to satisfy the evaluation provisions of section 810(a) of the Conservation Act. The Secretary asserts that "[T]here is no additional requirement that the agency decision maker have one statute in mind rather than another when he takes the action." This argument completely ignores this court's observation in Gambell I that section 810 was enacted because "the Secretary and the state [of Alaska] failed to heed Congress's admonition [that they take any action necessary to protect subsistence needs of Alaskan Natives]." Gambell I, 746 F.2d at 580.
 
 
 31
 The uncontradicted facts in this matter establish that the Secretary deliberately ignored the specific requirements of section 810(a) prior to the lease sales because of his erroneous belief that its provisions did not apply to the outer continental shelf. Nevertheless, we are now told that the Secretary complied with the Conservation Act prior to the lease sales because in meeting the requirements of the Environmental Act and the Lands Act he inadvertently considered the needs of the subsistence users. If we were to adopt this surprising contention, we would render section 810(a) superfluous and assume that its enactment was an idle act. "We should not and do not suppose that Congress intended to enact unnecessary statutes." Jackson v. Kelly, 557 F.2d 735, 740 (10th Cir.1977).
 
 
 32
 It is quite true that section 810(a) makes reference to the Environmental Act. Section 810(b) provides as follows:
 
 
 33
 If the Secretary is required to prepare an environmental impact statement pursuant to [Section 102(2)(c) of the National Environmental Policy Act], he shall provide the notice and hearing and include the findings required by subsection (a) of this section as part of such environmental impact statement.
 
 
 34
 16 U.S.C. Sec. 3120(b) (1982) (emphasis added). It is clear to us from this language that Congress intended that the section 810(a) requirement that the Secretary evaluate and make findings concerning subsistence needs supplements any overlapping duties which he may have under the Environmental Act.
 
 
 35
 In support of his contention that compliance with the Lands Act and the Environmental Act constitutes substantial compliance with the requirements of section 810(a) of the Conservation Act, the Secretary refers us to Life of Land v. Brinegar, 485 F.2d 460, 474 (9th Cir.1973), cert. denied, 416 U.S. 961, 94 S.Ct. 199, 40 L.Ed.2d 312 (1974), Citizens Airport Comm. v. Volpe, 351 F.Supp. 52 (E.D.Va.1972), Environmental Defense Fund, Inc. v. Froehlke, 473 F.2d 346, 356 (8th Cir.1972), Cape Henry Bird Club v. Laird, 484 F.2d 453, 454 (4th Cir.1973), and Missouri ex rel. Ashcroft v. Dep't. of Army, 526 F.Supp. 660, 667 (W.D.Mo.1980), aff'd, 672 F.2d 1297 (8th Cir.1982). These authorities do not support the Secretary's contention that compliance with either the Lands Act or the Environmental Act constitutes de facto compliance with the Conservation Act.
 
 
 36
 In Brinegar, we held that an environmental impact statement prepared pursuant to the Environmental Act may be considered as the finding of no adverse environmental effect required under section 16(c)(4) of the Airport and Airways Development Act of 1970 because each statute contains virtually the same requirements. 485 F.2d at 474. In Citizens Airport Comm., the district court noted, in passing, that "[t]he fact that the impact statement was prepared for the purpose of satisfying NEPA does not prevent its being used to satisfy the requirements of Sec. 1716 [of the Airport and Airways Development Act of 1970, 49 U.S.C. Sec. 1701 et seq.] if, in fact, it contains all of the findings demanded by that provision." 351 F.Supp. at 59. In Environmental Defense Fund, Inc. v. Froehlke, the court held that if an agency complies with the Environmental Act, it will " 'automatically take into consideration all of the factors required by the Fish and Wildlife Act and it is not reasonable to require them to do both separately.' " 473 F.2d at 356 (quoting Environmental Defense Fund, Inc. v. Corps of Engineers, 325 F.Supp. 749, 754 (E.D.Ark.1971), vacated on other grounds, 342 F.Supp. 1211 (E.D.Ark.1972)). We have no quarrel with the proposition that if the environmental concerns expressed in one statute are "automatically" taken into consideration on complying with the requirements of another Act of Congress, it would not be reasonable for the courts to insist on separate reports. As noted above, however, it was the failure of the Secretary to protect subsistence needs under existing administrative authority which compelled Congress to enact section 810(a). Gambell I, 746 F.2d at 580.
 
 
 37
 We previously have held that "compliance with one environmental statute does not assure compliance with another." Adler v. Lewis, 675 F.2d at 1096. Where each statute mandates separate and distinct procedures, compliance with the requirements of one does not compel the conclusion that the provisions of the other statute were considered. Id. Neither the Environmental Act nor the Lands Act sets forth procedures to ensure the protection of subsistence needs and uses. In contrast, the Conservation Act was created "to provide the opportunity for rural residents engaged in a subsistence way of life to continue to do so." Conservation Act Sec. 101(c), 16 U.S.C. Sec. 3101(c) (1982).
 
 
 38
 As we noted in Gambell I, "Congress found that continuation of the opportunity of rural Alaskans to make subsistence use of fish and wildlife 'is essential to [their] existence'." Id. at 580 (quoting Conservation Act Sec. 801(1), 16 U.S.C. Sec. 3111(1) (1980)). The separate and distinct procedures set forth in section 810(a) of the Conservation Act were enacted to fulfill that purpose. The Environmental Act and the Lands Act do not, by their terms, seek to advance the same Congressional goals. For purposes of resolving the issues presented in reviewing the denial of a preliminary injunction, we conclude that the district court did not err in its determination that there was a strong likelihood that the Villages would succeed at trial on the merits in their legal contention that substantial compliance with the Environmental Act and the Lands Act would not constitute automatic or substantial compliance with the Conservation Act.
 
 
 39
 The district court also concluded that the Villages had a strong likelihood of success on the merits of their contention that the Secretary violated the notice, hearing, and findings requirements of section 810(a)(1)-(3) in connection with Lease Sale 57. We agree.
 
 
 40
 Under section 810(a)(1)-(3), the Secretary is prohibited from leasing public lands without complying with the notice and hearing procedures if the agency concludes that the proposed action "may significantly restrict subsistence uses." Kunaknana v. Clark, 742 F.2d at 1151. After receiving this court's opinion in Gambell I, the Secretary conducted a post-sale study concerning Lease Sale 57. That report contains the finding that while the lease and exploration stages will not significantly restrict subsistence, development and production "may significantly restrict subsistence uses in certain areas." We made it clear in Kunaknana that under the express language of section 810(a)(3), the Secretary was required to comply with the notice and hearing requirements of the statute to determine inter alia whether " 'such a significant restriction of subsistence uses is necessary, consistent with sound management principles for the utilization of the public lands.' " 742 F.2d at 1150-51 (quoting section 810(a)(3)).
 
 
 41
 The Secretary argues that he was not required to comply with the notice and hearing requirements of section 810(a)(1)-(3) prior to the sale of the leases with respect to the significant restriction of subsistence use that may develop at the production stage. The Secretary relies on Secretary of Interior v. California, 464 U.S. 312, 104 S.Ct. 656, 78 L.Ed.2d 496 (1984). His reliance is misplaced. First, in Secretary of the Interior v. California, the Supreme Court did not concern itself with a construction of section 810(a)(1)-(3) of the Conservation Act. The Court was faced with the question whether section 307(c)(1) of the Coastal Zone Management Act applies prior to a lease sale. Id. at 315, 104 S.Ct. at 658. As the district court in the instant matter correctly noted, the decision of the Supreme Court that the Coastal Zone Management Act did not apply to lease sales was premised on the fact that Congress had recognized "four distinct statutory stages to developing an offshore oil well." Id. at 337, 104 S.Ct. at 669. The four steps set forth in the Lands Act are as follows:
 
 
 42
 1. The planning of a five-year nationwide leasing program. 43 U.S.C. Sec. 1344.
 
 
 43
 2. The lease sale. 43 U.S.C. Sec. 1337(a).
 
 
 44
 3. Exploration. 43 U.S.C. Sec. 1340.
 
 
 45
 4. Development and production. 43 U.S.C. Sec. 1351.
 
 
 46
 In the Conservation Act, however, Congress has expressly provided for a specific and detailed procedure to be followed in evaluating the impact on subsistence use of the lease of public land for exploratory activities. As this court pointed out in Kunaknana v. Clark, section 810(a) of the Conservation Act requires a hearing before a lease shall be effected if such lease "or other use, occupancy or disposition of such [public] lands" may significantly restrict subsistence use. 742 F.2d at 1150-51. "It is a basic rule of statutory construction that a specific statute controls over a general statute. HCSC-Laundry v. United States, 450 U.S. 1, 6, 101 S.Ct. 836, 838-39, 67 L.Ed.2d 1 (1981). If we were to hold that the more general statute controls over the specific one, we would effectively eliminate the specific statute." Edward D. Rollert Residuary Trust v. C.I.R., 752 F.2d 1128, 1133 (6th Cir.1985).
 
 
 47
 The district court did not err in determining, for purposes of ruling on the Villages' motion for a preliminary injunction, that the Villages had demonstrated a strong likelihood of success on the merits of their contention that the Secretary failed to comply with the notice and hearing requirements of the Conservation Act concerning Lease Sale 57. We are satisfied that there is a strong likelihood of success on the merits of the Villages' argument that the specific procedural requirements of section 810(a)(1)-(3)--which are triggered by the threat of a significant restriction of subsistence use--were intended by Congress to serve as an exception to the general provisions of the Lands Act.
 
 C. Balance of Irreparable Harm
 
 48
 Notwithstanding its determination that the Secretary violated the procedural requirements of section 810(a) of the Conservation Act, the district court denied the Villages' request for a preliminary injunction. The district court's ruling is not consistent with the law of this circuit. An injunction is the appropriate remedy for a substantive procedural violation of an environmental statute. See Thomas v. Peterson, 53 F.2d 754, 764 (9th Cir.1985). "Irreparable damage is presumed when an agency fails to evaluate thoroughly the environmental impact of a proposed action." Save Our Ecosystems v. Clark, 747 F.2d 1240, 1250 (9th Cir.1984). In Save Our Ecosystems v. Clark, we also noted that "[o]nly in a rare circumstance may a court refuse to issue an injunction when it finds a NEPA violation." Id. at 1250. " 'It does not appear that any lower court, much less the Supreme Court, has ever found in a proceeding on the merits that federal actions violating NEPA could continue in opposition to the statutory mandates.' " Id. at 1250 n. 15 (quoting Plater, Statutory Violations and Equitable Discretion, 70 Cal.L.Rev. 524, 575 (1982)).
 
 
 49
 Mindful of the law in this circuit, the district court concluded that there were unusual circumstances in the instant matter which made the issuance of an injunction "inappropriate." However, the court did not articulate the unusual circumstances upon which it relied to excuse its duty to issue an injunction in light of its determination that there was a strong likelihood that the Villages would prevail in their contention that section 810(a) of the Conservation Act had been violated. Instead, the court found as follows:
 
 
 50
 (1) That delay in the exploration of the OCS may cause irreparable harm to this nation's quest for new oil resources and energy independence. Expedited exploration as a policy is stated in OCSLA. See 43 U.S.C. Sec. 1332(3);
 
 
 51
 (2) That exploration will not significantly restrict subsistence resources; and
 
 
 52
 (3) That the Secretary continues to possess power to control and shape the off-shore leasing process. Therefore, if the ANILCA subsistence studies require alteration of the leasing conditions or configuratuion the Secretary will be able to remedy any harm caused by the violation.
 
 
 53
 The district court relied upon Forelaws on Board v. Johnson, 743 F.2d 677 (9th Cir.1984) and Alaska v. Andrus, 580 F.2d 465 (D.C.Cir.), vacated in part on other grounds as moot, 439 U.S. 922, 99 S.Ct. 303, 58 L.Ed.2d 315 (1978). These cases do not support the district court's conclusion that these factors justify the denial of an injunction under the circumstances of this case. Notwithstanding a violation of the Environmental Act, this court refused to issue an injunction in a matter over which it had original jurisdiction because such relief would interfere with the operation of 20-year contracts, most of which were then in the third year of their term. Forelaws on Board v. Johnson, 743 F.2d at 685. Here, however, the injunction was sought prior to the sale of any leases in the outer continental shelf; therefore, the issuance of an injunction, at the time it was requested, would not have interfered with a long-term contractual relationship. The first well on Lease Sale 83 was not spudded until June 2, 1985. The Villages' consolidated requests for injunctive relief were denied on May 23, 1985. Had the district court issued a preliminary injunction when it was first requested, no leases would have been made until the requirements of the Conservation Act were met.
 
 
 54
 Alaska v. Andrus is factually distinguishable and contrary to the law of this circuit. First, the D.C. Circuit Court apparently does not follow the Ninth Circuit rule that injunctive relief is the appropriate remedy for a violation of an environmental statute absent rare or unusual circumstances. See Thomas v. Peterson, 753 F.2d at 764 ("absent 'unusual circumstances,' an injunction is the appropriate remedy for a violation of NEPA's procedural requirements"); Alpine Lakes Protection Society v. Schlapfer, 518 F.2d 1089, 1090 (9th Cir.1975) (the policies underlying an environmental protection statute (NEPA) "weight the scale in favor of those seeking the suspension of all action until the Act's requirements are met"). The Ninth Circuit rule was not discussed in Alaska v. Andrus. Instead, the D.C. Circuit followed a rule which restricts the availability of an injunction against an ongoing project to cases where it is necessary primarily "to preserve for the relevant decisionmaker the full opportunity to choose among alternatives that is contemplated by NEPA." Alaska v. Andrus, 580 F.2d at 485.
 
 
 55
 This court has found "unusual circumstances" in cases which have upheld the denial of a preliminary injunction to enjoin a project from proceeding in violation of an environmental protection statute where irreparable harm to the environment would result if such relief were granted. Thomas v. Peterson, 753 F.2d at 764 n. 8. Similarly, in Alpine Lakes Protection Society v. Schlapfer, we denied a motion for an injunction pending appeal notwithstanding the presence of substantial questions concerning the Forest Service's compliance with the Environmental Act, because the issuance of an injunction against the use of a logging road would prevent the removal of diseased trees and permit the spread of insect infection throughout the adjacent national forest lands. 518 F.2d at 1090.
 
 
 56
 In American Motorcyclist Ass'n v. Watt, the plaintiffs filed an action to enjoin the Secretary's plan to conserve and protect the fragile resources in the California desert from recreational use. 714 F.2d at 963-64. The plaintiffs alleged that the plan would prevent traditional recreational vehicle use of the California desert and diminish the number of motorcycle events. Id. The district court expressly found that "there was a danger of harm to the fragile desert resources of the [California Desert Conservation Area] if the Plan's restrictions were lifted and plaintiffs were allowed to pursue increased motor vehicle use." Id. at 966. We upheld the denial of a preliminary injunction in American Motorcyclist Ass'n v. Watt in the face of a strong showing on the merits that the Secretary of the Interior had violated procedural provisions of the Environmental Act, because of the presence of unusual circumstances, i.e. the damage to fragile desert resources. Id. at 966-67. We discussed the impact of the exception to the rule set forth in Alpine Lakes Protection Society v. Schlapfer, requiring the issuance of a preliminary injunction upon a showing of a violation of the procedural prerequisites of an environmental statute, and explained: "Alpine thus authorizes the court not only to weigh the relative hardship and harms to the parties, but to examine how the greater public interest may be affected in the unusual case where enjoining government action allegedly in violation of NEPA might actually jeopardize natural resources." American Motorcyclist Ass'n v. Watt, 714 F.2d at 966.
 
 
 57
 In the matter before us the district court did not and could not make a finding that the issuance of a preliminary injunction preventing lease sales would endanger the subsistence uses and resources of the waters off the coast of Alaska. In fact, the Secretary's lease sale plan poses the type of danger to the subsistence culture of Alaskan Natives that moved Congress to enact section 810(a) of the Conservation Act. In Gambell I, we expressed this view as follows:
 
 
 58
 When Congress adopted the Claims Settlement Act it was aware that extinguishing Native rights might threaten subsistence hunting and fishing by Alaska Natives. The Senate version of the Claims Act included provisions directing the Secretary to protect subsistence uses on public lands. The Conference Committee eliminated this provision, but the Committee made it clear that it did so only because it concluded subsistence resources should be protected by the Secretary of Interior through the exercise of existing administrative authority. The Committee wrote: "The Conference Committee expects both the Secretary and the State to take any action necessary to protect the subsistence needs of the Natives." See H.Conf.Rep. No. 746, 92d Cong., 1st Sess. 37, reprinted in 1971 U.S.Code Cong. & Ad.News 2247, 2250. Title VIII of the Conservation Act was enacted because the Secretary and the state failed to heed Congress's admonition.
 
 
 59
 Gambell I, 746 F.2d at 580.
 
 
 60
 The record does not disclose any unusual circumstances which threaten the environment such as those which we recognized in Alpine Lakes Protection Society v. Schlapfer and American Motorcyclists Ass'n v. Watt, which would justify denial of a preliminary injunction where there is a strong likelihood that the Villages will succeed in demonstrating that the Secretary has violated a statute directed at preserving or conserving the environment. On the contrary, the Secretary's leasing plan poses a threat to the preservation of the subsistence culture of Native Alaskans. Nor would the issuance of a preliminary injunction have interrupted the performance of long-term contracts as was the case in Forelaws on Board v. Johnson. We conclude, therefore, that the district court erred in finding that this is the type of rare or unusual case that justifies the denial of a preliminary injunction in the face of its conclusion that there is a strong likelihood of success on the merits.
 
 D. Public Interest
 
 61
 As set forth above, the district court found that the public interest favored oil exploration in the outer continental shelf. This finding is not supported by a recitation of the facts relied upon by the district court that would demonstrate how the district court divined the public interest.
 
 
 62
 The Secretary correctly observes that the purpose of the 1978 amendments to the Lands Act was to expedite the
 
 
 63
 exploration and development of the Outer Continental Shelf in order to achieve national economic and energy policy goals, assure national security, reduce dependence on foreign sources, and maintain a favorable balance of payments in world trade....
 
 
 64
 43 U.S.C. Sec. 1802 (as amended 1978).
 
 
 65
 The Secretary continues to ignore, however, the fact that section 810(a) of the Conservation Act was adopted by Congress "to benefit the Natives" and to be "consistent with the Congressional policy established by section 802(1) that the management of the public lands shall cause the least adverse impact possible on rural residents who depend upon subsistence uses." Gambell I, 746 F.2d at 581 (quoting 126 Cong.Record 29,279 (1980)). As our highest court noted in a different context, "[t]he choice between these two policy arguments is not ours to make; it has already been made by Congress." Secretary of Interior v. California, 464 U.S. at 342, 104 S.Ct. at 672.
 
 
 66
 Congress enacted section 810(a) in 1980 to protect the subsistence culture of Native Alaskans from exploration of the outer continental shelf that would impair their subsistence needs and uses. The Conservation Act defines subsistence uses as follows:
 
 
 67
 [T]he customary and traditional uses by rural Alaska residents of wild, renewable resources for direct personal or family consumption as food, shelter, fuel, clothing, tools, transportation; for the making and selling of handicraft articles out of nonedible byproducts of fish and wildlife resources taken for personal or family consumption; for barter, or sharing for personal or family consumption; and for customary trade.
 
 
 68
 16 U.S.C. Sec. 3113 (1982).
 
 
 69
 The maintenance of this subsistence economy is requisite to the literal survival of these isolated Alaskan tribal villages. On St. Lawrence Island alone, 80 percent of all food consumed annually comes from the sea and land. A substantial portion of their cash income comes from carved walrus ivory. Moreover, even if the community's physical survival is not placed in immediate jeopardy by disruptions from oil and gas exploration, the very social structure of the village is jeopardized. "A reduced availability of naturally recurring resources ... alter[s] the depth, breadth and strength of the clans, the organizational core of society." Ronald L. Little and Lynn A. Robbins, Technical Report No. 89, Effects of Renewable Resource Harvest Descriptions on Socioeconomic and Sociocultural Systems: St. Lawrence Island, at 304 (emphasis added). Subsistence is nothing less than "a symbolic and organizational base for their spiritual life." Id. at 360.
 
 
 70
 The district court's finding that the public interest favored oil exploration over the preservation of the subsistence culture of the Alaskan Natives violates the clearly expressed Congressional intent that lease sales shall not be conducted until the Secretary has evaluated the effect of the Oil Companies' activities on the subsistence uses and needs of Native Alaskans. The by-products of oil and gas exploration such as potential oil spills, leakage, and noise pose the threat of disruption to subsistence economy sufficient to destroy irreparably the isolated and unique culture of the Native Alaskans. Id. at 330-374. This error of law compels reversal.[2]
 
 E. Retroactivity
 
 71
 The Secretary and the Oil Companies argue that our decision in Gambell I may not be applied retroactively to Lease Sale 83. This contention was not raised in the district court. Ordinarily, we "will not ... review an issue not raised below unless necessary to prevent manifest injustice." International Union of Bricklayers v. Martin Jaska, Inc., 752 F.2d 1401, 1404 (9th Cir.1985). However, we have the discretion to review issues raised for the first time on appeal "if it would not cause the parties to develop new facts." Whittaker Corp. v. Execuair Corp., 736 F.2d 1341, 1346 (9th Cir.1984). We will address the retroactivity issue because it does not involve a fact determination and because it is central to the case and important to the public. Commodity Futures Trading Comm'n v. Co Petro Marketing Group, Inc., 680 F.2d 573, 581 (9th Cir.1982).
 
 
 72
 The Secretary and the Oil Companies rely primarily upon Chevron Oil Co. v. Huson, 404 U.S. 97, 92 S.Ct. 349, 30 L.Ed.2d 296 (1971) to support their retroactivity argument. In Chevron Oil Co., the Supreme Court set forth the following test for determining whether to apply a court decision retroactively:
 
 
 73
 First, the decision to be applied nonretroactively must establish a new principle of law, either by overruling clear past precedent on which litigants may have relied, [citation omitted], or by deciding an issue of first impression whose resolution was not clearly foreshadowed, [citation omitted]. Second, it has been stressed that 'we must ... weigh the merits and demerits in each case by looking to the prior history of the rule in question, its purpose and effect, and whether retrospective operation will further or retard its operation.' [citation omitted]. Finally, we have weighed the inequity imposed by retroactive application, for '[w]here a decision of this Court could produce substantial inequitable results if applied retroactively, there is ample basis in our cases for avoiding the "injustice or hardship" by a holding of nonretroactivity.' [citation omitted].
 
 
 74
 404 U.S. at 106-07, 92 S.Ct. at 355-56.
 
 
 75
 Applying the Chevron factors, we are persuaded that our decision in Gambell I should be applied retroactively. Although Gambell I established a new principle of law in construing section 810(a) of the Conservation Act as applicable to the outer continental shelf, our review of the prior history of section 810(a) of the Conservation Act and its stated purpose satisfies us that retroactive application of Gambell I would further the operation of a statute enacted by Congress expressly to protect subsistence uses and resources from any harmful effects resulting from oil exploration. No substantial inequitable results would occur from retroactive application. See Barina v. Gulf Trading & Transportation Co., 726 F.2d 560, 563 (9th Cir.1984) (a decision should not be applied retroactively if it would produce substantial inequitable results). The facts demonstrate unequivocally that the Secretary conducted Lease Sale 83 with knowledge that his right to do so without complying with the Conservation Act was in doubt in light of the fact that an appeal was then pending on Lease Sale 57. Any financial losses which may have been incurred by the Oil Companies were also incurred with full knowledge of the risks involved in expending money at a time when the validity of leases sold without compliance with the Conservation Act was pending before the court. Under the Chevron test, retroactive application of our prior decision in Gambell I is proper.
 
 F. Laches
 
 76
 The Secretary and the Oil Companies assert that the Villages' motion for a preliminary injunction of exploratory activities on Lease Sale 83 is barred by laches. This contention is predicated on the fact that this action to enjoin Lease Sale 83 was filed on April 25, 1985, more than one year after the notice of sale was published on April 17, 1984.
 
 
 77
 We agree with the Villages that the district court properly rejected the laches claim. In order to prevail on this equitable defense, the Secretary and the Oil Companies must have demonstrated that the Villages unreasonably delayed in asserting a known legal right and that this delay caused the Secretary and the Oil Companies prejudice. See Coalition for Canyon Preservation v. Bowers, 632 F.2d 774, 779 (9th Cir.1980). We review the district court's ruling concerning the defense of laches for an abuse of discretion. Id.
 
 
 78
 We conclude that the Villages' delay was reasonable for the following reasons:
 
 
 79
 (1) On March 4, 1983, more than one year before the sale was held, the Village of Gambell gave the Secretary notice that it believed that section 810 of the Conservation Act applied to leases of public lands in the outer continental shelf by filing a claim for injunctive relief concerning Lease Sale 57.
 
 
 80
 (2) On April 17, 1984, Lease Sale 83 was held.
 
 
 81
 (3) On November 24, 1984, we issued our decision in Gambell I wherein we held that section 810 of the Conservation Act applied to leases in the outer continental shelf. Gambell I, 746 F.2d at 582. On May 10, 1983, prior to Lease Sale 83, a motions panel of this court had held that there was insufficient reason to enjoin lease sales in the outer continental shelf pending appeal of the denial of the preliminary injunction requested to prevent Lease Sale 57.
 
 
 82
 (4) Thus, a challenge to Lease Sale 83 would have been useless.
 
 
 83
 Under these circumstances, the district court did not abuse its discretion in holding that the delay was reasonable and did not cause the Secretary or the Oil Companies any prejudice which was not the result of a calculated risk.
 
 CONCLUSION
 
 84
 The Secretary failed to evaluate the effect on subsistence uses and needs of the Alaskan Natives prior to Lease Sale 57 and Lease Sale 83 because of his belief that section 810(a) of the Conservation Act did not apply to the outer continental shelf. For purposes of reviewing the denial of a preliminary injunction, we conclude that the district court correctly determined that there was a strong likelihood that the Villages would succeed in their claim that the Secretary failed to comply with section 810 of the Conservation Act.
 
 
 85
 The district court erred as a matter of law in concluding that these facts presented rare or unusual circumstances justifying a failure to follow the rule that a preliminary injunction should issue where a federal agency has violated the procedural requirements of an environmental protection or conservation statute. Under these facts, the issuance of a preliminary injunction would not have resulted in a belated interruption of long term contracts or interfered with any plan to preserve subsistence uses or to protect the environment. Instead, the Secretary's plan involves exploitation of finite environmental resources and a potential threat to the subsistence culture of Alaskan Natives.
 
 
 86
 The Conservation Act was amended in 1980 for the express purpose of compelling the Secretary to consider subsistence uses and needs in exploring and developing our oil resources in the public lands beneath the outer continental shelf. The public interest as expressed by Congress in the 1980 amendments to the Conservation Act requires that the uses and needs of the Alaskan Natives, and our national concern over survival of their culture, must prevail over our possible energy needs. Thus, the denial of a preliminary injunction was error because the court misapplied the law of the circuit concerning the "unusual circumstances" exception and failed to honor the announced policy of Congress favoring the rights of Alaskan Natives over this nation's need to exploit the potential oil resources under the waters of the outer continental shelf off the shores of Alaska.
 
 
 87
 The district court is directed to enter a preliminary injunction enjoining all activities in connection with Lease Sale 57 and Lease Sale 83 pending its determination of the consolidated claims for injunctive relief and pending resolution of the issues which it must address pursuant to the instructions of this court in Gambell I.
 
 
 88
 In accordance with the stipulation of the parties, the hold harmless agreement will terminate as of the date that the Oil Companies inform this court that their 1985 drilling operation in Lease Sale 57 and Lease Sale 83 have terminated and that all drilling rigs and support craft have vacated the area.
 
 
 89
 Reversed and Remanded.
 
 
 90
 DIMMICK, District Judge (dissenting).
 
 
 91
 This is the second time this court has punted to the trial court. In the first appeal, Village of Gambell v. Clark, 746 F.2d 572 (9th Cir.1984) ("Gambell I ") it was clear that the Secretary of Interior had violated an environmental statute by not complying with section 810 of the Alaska National Interest Lands Conservation Act (ANILCA). The court, however, did not direct the trial court to enter an injunction. Instead, the only guidance it gave to the trial court was for it to determine "the proper remedy." Id. at 573. The trial court determined that, at this time, a proper remedy does not include a preliminary injunction.
 
 
 92
 The majority now tells the trial court, on the same facts available in Gambell I, that the trial court erred and that it must enter a preliminary injunction. Nevertheless, the majority does not tell the trial court whether a permanent injunction must be issued, or whether post-sale compliance with section 810 is acceptable. Thus, this case will probably become a trilogy.
 
 
 93
 Our review of the trial court's decision denying the preliminary injunction is limited. Apple Computer, Inc. v. Formula International, Inc., 725 F.2d 521 (9th Cir.1984). The trial court's decision to grant or deny an injunction is discretionary and will be reversed only if based on erroneous legal standards or clearly erroneous findings of fact. Sports Form, Inc. v. United Press International, 686 F.2d 750 (9th Cir.1982). I find that the trial court used the correct legal standard and that its findings of fact are supported by the record. Thus, I would affirm its discretionary decision to deny the preliminary injunction. I would also not apply Gambell I retroactively to Lease No. 83.
 
 I.
 
 94
 The trial court found that while appellants were likely to succeed on the merits the balancing of the irreparable harms favored appellees, not appellants. It accordingly refused to issue a preliminary injunction.
 
 
 95
 The majority, in reversing the trial court's decision, advances a new rule: absent unusual circumstances, an injunction must be issued when an environmental statute has been violated.[1] The Supreme Court, however, has rejected such a rigid approach to the issuance of an injunction. In Weinberger v. Romero-Barcelo, 456 U.S. 305, 102 S.Ct. 1798, 72 L.Ed.2d 91 (1982), the Navy had violated the provisions of an environmental statute--the federal Water Pollution Prevention and Control Act, 33 U.S.C. Sec. 1251 (1982). The district court refused to enter an injunction pending compliance. The Court of Appeals for the First Circuit reversed holding that the district court was required to enter an injunction. Romero-Barcelo v. Brown, 643 F.2d 835 (1st Cir.1981). The First Circuit stated that "regardless of the district court's finding that the Navy's dropping of ordinance caused no significant harm to the environment, it erred in failing to consider the judiciary's 'responsibility to protect the integrity of the ... process mandated by Congress....' " Id. at 861 (citations omitted). The Supreme Court reversed. The Court noted that the equitable remedy of an injunction requires flexibility and the exercise of discretion and that it should only be entered to protect a party from irreparable harm. Weinberger v. Romero-Barcelo, supra 456 U.S. at 312, 102 S.Ct. at 1803. The majority does not include this case in its analysis of when an injunction should be issued for the violation of an environmental statute. (See Majority Opinion, section C.) In my opinion it is binding precedent.
 
 
 96
 While there is a presumption that irreparable harm flows from a violation of an environmental statute, Thomas v. Peterson, 753 F.2d 754 (9th Cir.1985), such a presumption is not irrebuttable. A party opposing the issuance of an injunction may present evidence showing that no irreparable harm will occur. Appellees have done exactly that. Appellees presented the trial court with substantial evidence showing that it was highly unlikely that exploratory activities would adversely affect subsistence resources. In addition, appellees presented evidence which showed that they would have suffered irreparable harm if a preliminary injunction had been issued. At the time the district court was deciding whether to enter a preliminary injunction, Exxon, Amoco, and ARCO had committed almost $70 million in support of their plans to explore Lease Tracts Nos. 57 and 83 during the summer of 1985. If the trial court had enjoined their exploration activities their money would have been lost. The permanent loss of $70 million constitutes substantial irreparable harm. In contrast, the appellants advanced two arguments to support the presumption of irreparable harm: (1) the danger of bureaucratic commitment and (2) speculative harm to the environment. The record amply supports the trial court's conclusion that appellants would not suffer any significant harm.[2] Thus, appellees successfully rebutted the presumption which favored appellants. Accordingly, the trial court did not err in refusing to grant the injunction.
 
 II.
 
 97
 The Lease No. 83 sales were conducted six and one-half months before this court filed its decision in Gambell I. Appellants, who were aware of Lease Sale No. 83, did not file a suit advancing the ANILCA claim as they had done in Lease No. 57. Moreover, they did not challenge Exxon's, ARCO's or Amoco's plans of exploration which were approved by the Department of Interior. Relying on these approvals, Exxon, ARCO, and Amoco committed over $60 million preparing for the 1985 drilling season. It was not until April 22, 1985, a full year after the lease sales were conducted and five months after Gambell I was decided that appellants filed a complaint arguing that Lease Sale No. 83 should also be voided.
 
 
 98
 In Chevron Oil Co. v. Huson, 404 U.S. 97, 92 S.Ct. 349, 30 L.Ed.2d 296 (1971), the Supreme Court set forth three factors to be used for determining whether to apply a court decision retroactively.[3] The majority concedes that Gambell I established a new principle of law. This weighs in favor of not applying Gambell I to Lease No. 83. I disagree, however, with the majority's conclusions as to the other two factors.
 
 
 99
 The majority concludes, without providing an adequate explanation, that the retroactive application of Gambell I would further the operation of the statute. Contrary to the majority's assertion, the trial court specifically found that there is no reason to believe that any aspect of Sale No. 83 will restrict subsistence uses. Moreover, retroactive application of Gambell I is unnecessary to achieve the statute's goals. Instead, those goals can be fully realized by a declaration that ANILCA evaluations must be published for future Alaska OCS sales and that the evaluations must be prepared for the exploration and development/production plans of all prior sales.
 
 
 100
 Applying the third factor, the majority finds that no substantial inequitable results would follow from retroactive application. The majority views any financial loss which the appellees may have suffered as a calculated risk on their part because an appeal was pending in this court on Lease No. 57. I do not agree. As noted earlier, appellants did not object to Lease Sale No. 83. Nor did they file any objections to the plans of exploration which were approved. When the oil companies made their expenditures they were relying on a valid court judgment and relying on approved plans of exploration. To hold that those oil companies were taking a "risk" is an unfair characterization of the circumstances. To now apply a new legal principle which is unnecessary to advance the goals of a statute defies the concept of fair play.
 
 III.
 
 101
 I believe this court, as in Gambell I, is not giving the trial court adequate guidance. In footnote 2 of its opinion, the majority states that "[i]n the absence of a fully developed trial record, we cannot now decide whether a permanent injunction should issue in this matter." Such a statement leads me to ask: What additional facts are necessary? Can the appellants produce any additional evidence that will be relevant to the decision whether a permanent injunction should be issued? I think not. The majority holds that a violation of environmental statute, absent exceptional circumstances, requires that an injunction be issued. The majority finds that no exceptional circumstances exist here and that the Secretary of Interior has violated an environmental statute. Therefore, under the majority's holding, a permanent injunction must be issued.[4]
 
 
 102
 This court should also tell the trial court what will constitute acceptable compliance. That is, will a section 810 analysis performed after a lease sale satisfy the statute's requirements? This issue is critical because the Department of Interior complied with the requirements of section 810 but did so after the lease sale.[5] If a post-sale section 810 analysis will not satisfy the statute's requirements, the sales of Leases Nos. 57 and 83 must be voided. If a post-sale section 810 analysis is satisfactory, then the majority should clearly state this. Then the trial court, on remand, could determine whether the two studies done after the sale are adequate. Such a holding would not require that post-sale compliance would always be satisfactory. Under the circumstances of this case, however, allowing post-sale compliance may well be appropriate. In future lease sales, post-sale analysis may not be satisfactory since the Department of Interior now has notice that it must comply with section 810 before such sales.
 
 
 103
 The majority fails to address this issue. Consequently, the trial court will be forced once again, as it was after Gambell I, to decide a question of law. The losing party will appeal which will result in more delay and uncertainty as to the parties' rights. Because this issue has not been resolved, we will, in all probability, see Gambell III before Rambo III. I therefore dissent, respectfully.
 
 
 
 *
 Honorable Carolyn R. Dimmick, United States District Judge for the Western District of Washington, sitting by designation
 
 
 [1]
 On this appeal from consolidated motions for preliminary injunction, the Villages include The People of the Village of Gambell and The People of the Village of Stebbins, two Alaskan Native Tribes organized under the Indian Reorganization Act. Also included is Nunam Kitlutsisti, an intertribal organization representing subsistence users from 56 villages of the Yukon-Kuskokwian Delta in southwestern Alaska
 
 
 [2]
 Appellees rely on Weinberger v. Romero-Barcelo, 456 U.S. 305, 102 S.Ct. 1798, 72 L.Ed.2d 91 (1982) for the proposition that "[a] showing of threatened irreparable harm has always been the prime prerequisite for obtaining injunctive relief." Brief for the Federal Appellees, p. 40. Romero-Barcelo is distinguishable from the matter before us in several important respects
 First, Romero-Barcelo did not involve the tension between the requirements of the Conservation Act and the Lands Act. Instead, the narrow question before the Court in Romero-Barcelo was stated as follows:
 The issue in this case is whether the Federal Water Pollution Control Act (FWPCA or Act), 86 Stat. 816, as amended, 33 U.S.C. Sec. 1251 et seq. (1976 ed. and Supp. IV), requires a district court to enjoin immediately all discharges of pollutants that do not comply with the Act's permit requirements or whether the district court retains discretion to order other relief to achieve compliance.
 456 U.S. at 306-07, 102 S.Ct. at 1800-01. The Supreme Court observed that injunctive relief was not the only means of insuring compliance under the statute. The Court noted that "[t]he FWPCA itself, for example, provides for fines and criminal penalties. 33 U.S.C. Secs. 1319(c) and (d)." Id. at 314, 102 S.Ct. at 1804. The Court construed the statute as permitting the district court "to order that relief it considers necessary to secure prompt compliance with the Act. That relief can include, but is not limited to, an order of immediate cessation." Id. at 320, 102 S.Ct. at 1807. Unlike the FWPCA, the injunctive relief we grant is the only means of insuring compliance under section 810.
 In Romero-Barcelo, the Supreme Court contrasted the requirements imposed by Congress in the FWPCA with its construction of the Endangered Species Act (87 Stat. 884, 16 U.S.C. Sec. 1531 et seq.) in Tennessee Valley Authority v. Hill, 437 U.S. 153, 98 S.Ct. 2279, 57 L.Ed. 117 (1978). In TVA v. Hill, the Supreme Court held that an imminent violation of the Endangered Species Act required injunctive relief. Id. at 172-73, 98 S.Ct. at 2290-91. In Romero-Barcelo, the Court summarized its holding in TVA v. Hill as follows:
 Refusal to enjoin the action would have ignored the 'explicit provisions of the Endangered Species Act.' 437 U.S., at 173 [98 S.Ct. at 2291]. Congress, it appeared to us, had chosen the snail darter over the dam. The purpose and language of the statute limited the remedies available to the District Court; only an injunction could vindicate the objectives of the Act.
 Romero-Barcelo, 456 U.S. at 314, 102 S.Ct. at 1804 (emphasis added).
 It appears to us that in enacting section 810, Congress has chosen the protection of subsistence life over oil exploration. Thus, only the issuance of a preliminary injunction to compel compliance with the requirements of section 810 can uphold Congressional intent. "Once Congress, exercising its delegated powers, has decided the order of priorities in a given area, it is for the Executive to administer the laws and for the courts to enforce them when enforcement is sought." TVA v. Hill, 437 U.S. at 194, 98 S.Ct. at 1804.
 Secondly, Romero-Barcelo is not dispositive because in that matter the district court denied injunctive relief after a trial on the merits of the complaint for injunctive relief. This matter is before us on an interlocutory appeal. We do not know what evidence will be developed at trial. In the absence of a fully developed trial record, we cannot now decide whether a permanent injunction should issue in this matter. The fact, as noted by our dissenting colleague, that this court may visit this case again should not cause us to issue an advisory opinion or attempt to usurp the function of the district court. Congress has determined that interlocutory review is available to persons seeking review of an order granting or refusing an injunction. 28 U.S.C. Sec. 1292(a)(1). The plaintiffs in this matter have properly exercised their rights.
 
 
 [1]
 The majority promulgates this rule as if it were well settled. That is not the case. If it were this court in Gambell I would have directed the trial court to enter an injunction since it was evident at that time that an environmental statute had been violated and that no unusual circumstances existed
 
 
 [2]
 The majority fails to specify what irreparable harms appellants will suffer and I fail to find any
 
 
 [3]
 The three factors are: (1) does the decision establish a new principle of law; (2) will retroactive application of the decision further or retard its application; and (3) is it equitable to apply the decision retroactively. Chevron Oil Co. v. Huson, 404 U.S. 97, 106-107, 92 S.Ct. 349, 355-56, 30 L.Ed.2d 296 (1971)
 
 
 [4]
 The majority states that if it were to decide this issue it would be usurping the function of the district court. I cannot agree that providing the trial court with adequate guidance as to the proper application of the law can ever be characterized as usurping its function
 
 
 [5]
 Less than six months after Gambell I was decided, the Department of Interior performed a section 810 analysis for Lease No. 57 finding that the sale would not significantly restrict subsistence uses. Less than one month after Gambell I, the Department performed an OCS Environmental Assessment which included a section 810 analysis for Exxon's, ARCO's, and Amoco's plans of exploration for tracts in Lease No. 83. In that assessment, the Department of Interior found that the exploration proposals of the three oil companies would not significantly restrict subsistence uses