816 F.2d 1376
 17 Envtl. L. Rep. 20,717
 SIERRA CLUB, a California non-profit corporation; League
for Coastal Protection, a California non-profit
corporation, Plaintiffs-Appellants,
v.
John O. MARSH, Jr., Secretary of the Army; Colonel Fred
Butler, District Engineer of the U.S. Army Corps of
Engineers; Elizabeth Dole, Secretary of Transportation;
Ray A. Barnhart, Administrator of the Federal Highway
Administration; Leo J. Trombatore, Director of the
California Department of Transportation; County of San
Diego; City of Chula Vista; Donald P. Hodel, Secretary of
the Interior; Santa Fe Land Improvement Company,
Defendants- Appellees.
 No. 87-5531.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted April 6, 1987.
Decided May 8, 1987.
 
 Laurens H. Silver, San Francisco, Cal., for plaintiffs-appellants.
 Eileen Sobeck, Washington, D.C., Robert L. Meyer, George B. Blackmar, and Robert M. Gans, San Diego, Cal., for defendants-appellees.
 Appeal from the United States District Court for the Southern District of California.
 Before GOODWIN, SNEED and BOOCHEVER, Circuit Judges.
 BOOCHEVER, Circuit Judge:
 
 
 1
 The Sierra Club and the League for Coastal Protection appeal the district court's denial of their motion for a preliminary injunction halting construction of a combined highway and flood control project in southern San Diego County. They assert that the County of San Diego's failure to transfer 188 acres of land necessary to mitigate the project's effects on two endangered species of birds and the possibility of increased development on nearby private lands require a reinitiation of consultation between the Fish and Wildlife Service and the Army Corps of Engineers to determine whether additional modifications to the project are needed to prevent injury to the birds. We reverse the denial of the preliminary injunction.
 
 FACTS
 
 2
 The California least tern (Sterne albifrons browni ) and the light-footed clapper rail (Rallus longirostris levipes ) are listed as endangered species under the Endangered Species Act of 1973, 16 U.S.C. Secs. 1531-1543 (1982 & Supp. III 1985) (the ESA or the act). 50 C.F.R. Sec. 17.11(h) (1986). These birds nest and forage in the coastal marshes of southern California and Mexico. Their numbers have declined as this habitat has disappeared and they are endangered throughout their ranges. The wetlands surrounding San Diego Bay are a significant portion of the birds' remaining habitat. Sweetwater Marsh contains approximately 75 percent of San Diego Bay's remaining wetlands and has been identified as habitat essential to the survival of the rail and the tern.
 
 
 3
 The federal project consists of the construction of a flood control channel in the flood plain of the Sweetwater River; construction of State Route 54 (SR 54), connecting Interstate Route 5 (I-5) and Interstate Route 805; construction of an interchange between I-5 and SR 54; and widening of I-5. The Army Corps of Engineers (COE or corps) is the federal sponsor of the flood control channel and is providing funding for it; the Federal Highway Administration (FHWA) is supervising and funding the highway construction. Pursuant to an agreement with the federal agencies, the California Department of Transportation (Caltrans) is in charge of the construction of both the highway and flood control elements of the project. The design and construction of the highways and channel are integrated: along much of its length the channel lies in the median of SR 54 and the material excavated from the channel is used to build the highways. There are three phases in the project's construction. Phase I has been substantially completed; phase II began in May 1985. The second phase includes work on the interchange between SR 54 and I-5 and on the flood control channel in the vicinity of the interchange. On January 16, 1987, Caltrans started work on the channel and interchange in the area west of I-5, where Sweetwater Marsh is located.
 
 
 4
 Almost from the project's inception in 1968, the Fish and Wildlife Service of the Department of the Interior (FWS or service) has expressed concern about its effects on the birds and other organisms dependent on the estuary for food and shelter. By the passage of the Endangered Species Act of 1973,[1] Congress prohibited federal agencies from authorizing, funding, or carrying out actions that would jeopardize the continued existence of endangered species. 16 U.S.C. Sec. 1536(a)(2) (as amended). The primary responsibility for insuring that federal projects do not harm endangered species or their habitats rests with the FWS. Id. at (b); 50 C.F.R. Sec. 402.01(b). The agency taking the action must assess the project's effects on endangered or threatened species and consult with the FWS to assure the project's compliance with the ESA. 16 U.S.C. Sec. 1536(a) & (c). After consultation, the FWS issues an opinion, often referred to as a "biological opinion," stating its conclusion as to whether the project would violate the ESA. Id. at (b). If the FWS does determine the project would jeopardize endangered species or their habitat, the opinion must specify any "reasonable and prudent alternatives" that would sufficiently mitigate the project's adverse effects. Id. at (b)(3)(A).
 
 
 5
 In its first opinions, the FWS concluded that the project's direct and indirect impacts would jeopardize the continued existence of the rail and tern. The major impact identified by the service was destruction of habitat: construction of the flood control channel would destroy more than 40 acres of marshland.[2] It listed nine measures for mitigating the project's effects. One measure the FWS considered vital was that the COE acquire and preserve 188 acres of nearby wetlands. Forty-four acres of these "mitigation lands" would replace the acreage occupied by the channel; the remainder would provide additional habitat for the birds and buffer zones to protect the habitat.[3] In essence, the FWS was recommending a trade: in exchange for the habitat destroyed or adversely modified by the project, the COE would acquire and preserve from destruction 188 acres of marshland.
 
 
 6
 In response to the FWS's objection and recommendations, the COE reinitiated consultation with it in 1981. The corps adopted the service's recommendations and modified the project's design accordingly. The FWS concluded in its final opinion, dated October 23, 1981, that the modifications and mitigation measures would "provide the minimally acceptable loss compensation requirements needed to protect and maintain wetland habitat and endangered species." In the project's final environmental impact statement and its certification of consistency with the California Coastal Act,[4] the COE relied on the planned acquisition and preservation of 188 acres of marsh for its conclusion that the project was not likely to jeopardize the birds' continued existence.
 
 
 7
 The federal agencies assumed throughout the planning process that the federal government would acquire the mitigation lands directly. To do so, Congress must grant the agencies authority to purchase or condemn the property. See United States v. 36.96 Acres of Land, 754 F.2d 855, 858-59 (7th Cir.1985), cert. denied, --- U.S. ----, 106 S.Ct. 1956, 90 L.Ed.2d 364 (1986). The agencies had taken the first steps toward obtaining authorization, including preparation of an additional environmental impact statement. Nevertheless, considerably more time would pass before Congress approved the acquisition. To speed the project's construction, the County of San Diego (County), the project's local sponsor, offered to obtain the property and transfer it to the state or federal agency designated by the COE. The County and the COE signed a contract, referred to as a "Section 221 Agreement,"[5] on December 18, 1984. In it, the County promised to transfer the mitigation lands within one year in consideration for the COE's commencing construction of the flood control channel.
 
 
 8
 The County has failed to perform. It requested two extensions of the deadline for performance, which the COE denied. On August 1, 1986, the County, the City of Chula Vista (Chula Vista), and the owner of the land, the Santa Fe Land Improvement Company (Santa Fe), entered into an escrow agreement that conditioned the transfer of the land to the County on the COE's issuance of several permits needed for development on nearby private lands. The escrow agreement also reserved seven easements in the mitigation lands, which both the COE and FWS contend would reduce or eliminate the land's value as habitat for the endangered species.[6]
 
 
 9
 In addition to the County's failure to transfer the mitigation lands, the California Coastal Commission approved Chula Vista's Local Coastal Program in September 1984. This development program calls for a 440-room hotel and convention center on Gunpowder Point[7], high-rise residential buildings on D Street Fill[8], and access roads to these developments. In the preparation of the final environmental impact statement by the COE and the biological opinions by the FWS, the agencies did not consider the effects these private projects would have on the adjacent wetlands because the Coastal Commission had not yet approved the plan. The commission had disapproved the entire plan in the spring of 1981 and its decision was upheld by the California Court of Appeal on July 2, 1982. See City of Chula Vista v. Superior Court, 133 Cal.App.3d 472, 183 Cal.Rptr. 909 (1982). The FWS concluded that the failure to acquire the mitigation lands and the commission's recent approval of increased development on the nearby uplands were likely to jeopardize the continued existence of the endangered species and requested that the COE reinitiate consultation with the service.
 
 
 10
 The COE refused. Although it did not inform the FWS of its reasons for refusing until well after this litigation had commenced, the COE contends that it will succeed in obtaining the mitigation lands free of the objectionable easements and that the private development is as yet uncertain to take place. The COE points out that this development will require ten federal permits, none of which has been issued; a comprehensive environmental impact statement on the entire project; and an additional consultation with the service under the ESA. At its core, the COE's argument is that reinitiation of consultation is premature.
 
 
 11
 On September 17, 1986, the Sierra Club and the League for Coastal Protection (Sierra Club) filed a complaint under the act's citizen suits provision, 16 U.S.C. Sec. 1540(g), after complying with that section's notice requirements. The Sierra Club asserted that the COE violated the act by refusing to reinitiate consultation with the FWS. It sought a preliminary and permanent injunction prohibiting further construction on the project until the County transferred the mitigation lands pursuant to the Section 221 Agreement, a declaratory judgment that the COE's refusal was a violation of the ESA and the regulations promulgated under it, and a preliminary and permanent injunction against construction until consultation with the FWS is reinitiated and completed. Caltrans, the County, Chula Vista, and Santa Fe opposed the Sierra Club's motion. The federal defendants--the COE, the FHWA, the Department of Transportation, and the Department of the Interior--filed a cross claim against the County on November 17 seeking specific performance of the Section 221 Agreement in addition to opposing the motion.
 
 
 12
 The district court held hearings on the motion for preliminary injunctions and denied it. The court also denied the request for a stay of construction pending appeal. The Sierra Club filed an emergency motion with this court for an injunction pending appeal. The motions panel denied the request and scheduled an expedited appeal.
 
 ANALYSIS
 I. Standard of Review
 
 13
 Appellate review of a decision to grant or deny a preliminary injunction is restricted to determining whether the lower court abused its discretion or based its decision on an erroneous legal standard or clearly erroneous findings of fact.[9] Oakland Tribune, Inc. v. Chronicle Publishing Co., 762 F.2d 1374, 1376 (9th Cir.1985). Unless a district court incorrectly applies the law, its grant or denial of a motion for a preliminary injunction is subject to very limited review. Id. Yet, "[t]his is an equity case, and it is well established that in such a case, although a reviewing court will usually decide only those issues which are necessary to dispose of an appeal, an interlocutory appeal brings the entire case before the court." Aerojet-General Corp. v. American Arbitration Ass'n, 478 F.2d 248, 252 (9th Cir.1973). The Sierra Club asked for both preliminary and permanent injunctions on the issues being appealed, and the district court's denial of injunctive relief rested primarily on interpretations of law, not on the resolution of factual disputes. With the exception of the cross claim, the record is fully developed and the parties ask us to interpret statutes and regulations in determining whether the district court erred. In such situations, we consider the merits of the case and enter a final judgment to the extent appropriate. Id. at 252-53; Noxell Corp. v. Firehouse No. 1 Bar-B-Que Restaurant, 760 F.2d 312, 315 (D.C.Cir.1985); West Virginia Ass'n of Community Health Centers, Inc. v. Heckler, 734 F.2d 1570, 1577-80 & n. 11 (D.C.Cir.1984); Energy Action Educ. Found v. Andrus, 654 F.2d 735, 745-46 & n. 54 (D.C.Cir.1980), rev'd on other grounds, 454 U.S. 151, 102 S.Ct. 205, 70 L.Ed.2d 309 (1981); Hurwitz v. Directors Guild of America, Inc., 364 F.2d 67, 70 (2d Cir.), cert. denied, 385 U.S. 971, 87 S.Ct. 508, 17 L.Ed.2d 435 (1966). See also Sierra On-Line, Inc. v. Phoenix Software, Inc., 739 F.2d 1415, 1421-22 (9th Cir.1984); Leubsdorf, The Standard for Preliminary Injunctions, 91 Harv.L.Rev. 525, 557 (1978) (appellate courts can speed the resolution of disputes by expressing their views of legal issues properly presented on interlocutory appeal); C. Wright, A. Miller, E. Cooper & E. Gressman, Federal Practice and Procedure Sec. 3921, at 17 (1977 & Supp.1986) ("Jurisdiction of the interlocutory appeal is in large measure jurisdiction to deal with all aspects of the case that have been sufficiently illuminated to enable decision by the court of appeals without further trial development."). The posture of this case is in sharp contrast to three situations we see all too often: (1) parties taking interlocutory appeals where little harm would result from awaiting a final decision, (2) where there is not a fully developed record, or (3) where the dispute turns on the resolution of complex factual issues. In these cases, our review is truly limited and the parties often could have saved their resources and ours by proceeding directly to a trial of the merits. Sports Form, Inc. v. United Press Int'l, Inc., 686 F.2d 750, 752-53 (9th Cir.1982).
 
 
 14
 II. Injunctions under the Endangered Species Act
 
 
 15
 In most cases, a party is entitled to a preliminary injunction after clearly demonstrating: (1) a likelihood of success on the merits and the possibility of irreparable injury or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in favor of the party seeking relief. These are not two independent tests but simply the extremes of the continuum of equitable discretion. Los Angeles Memorial Coliseum Comm'n v. National Football League, 634 F.2d 1197, 1200-01 (9th Cir.1980). The district court applied this test in denying the Sierra Club's motion for injunctive relief.
 
 
 16
 This is not the test for injunctions under the Endangered Species Act. In TVA v. Hill, 437 U.S. 153, 173, 193-95, 98 S.Ct. 2279, 2291, 2301-02, 57 L.Ed.2d 117 (1978), the Supreme Court held that Congress had explicitly foreclosed the exercise of traditional equitable discretion by courts faced with a violation of section 7 of the ESA. At the time of that decision, section 7 commanded "all federal agencies 'to insure that actions authorized, funded, or carried out by them do not jeopardize the continued existence' of an endangered species." 437 U.S. at 173, 98 S.Ct. at 2291 (quoting 16 U.S.C. Sec. 1536 (1976); emphasis supplied by the Court).[10]
 
 
 17
 Here we are urged to view the Endangered Species Act "reasonably," and hence shape a remedy "that accords with some modicum of common sense and the public weal." But is that our function? We have no expert knowledge on the subject of endangered species, much less do we have a mandate from the people to strike a balance of equities on the side of the Tellico Dam. Congress has spoken in the plainest of words, making it abundantly clear that the balance has been struck in favor of affording endangered species the highest of priorities, thereby adopting a policy which it described as "institutionalized caution."
 
 
 18
 Hill, 437 U.S. at 194, 98 S.Ct. at 2302 (citation to dissent omitted). The Court noted that the "language, history, and structure" of the act "indicates beyond doubt that Congress intended endangered species to be afforded the highest of priorities." Id. at 174, 98 S.Ct. at 2297. Congress considered and rejected language that would have permitted an agency to weigh the preservation of species against the agency's primary mission. Id. at 181-82, 98 S.Ct. at 2295-96. In Congress's view, projects that jeopardized the continued existence of endangered species threatened incalculable harm: accordingly, it decided that the balance of hardships and the public interest tip heavily in favor of endangered species. Id. at 187-88, 194-95, 98 S.Ct. at 2298-99, 2301-02. We may not use equity's scales to strike a different balance.
 
 
 19
 The Supreme Court has adhered to its view that section 7 is a significant restriction on courts' equity jurisdiction. In holding that the Federal Water Pollution Control Act (FWPCA) does not always require courts to issue injunctions to enforce compliance, the Court contrasted that statute with the ESA:
 
 
 20
 In TVA v. Hill, we held that Congress had foreclosed the exercise of the usual discretion possessed by a court of equity. There, we thought that "[o]ne would be hard pressed to find a statutory provision whose terms were any plainer" than that before us. 437 U.S., at 173 [98 S.Ct., at 2291]....
 
 
 21
 It was conceded in Hill that completion of the dam would eliminate an endangered species by destroying its critical habitat. Refusal to enjoin the action would have ignored the "explicit provisions of the Endangered Species Act." 437 U.S., at 173 [98 S.Ct., at 2291]. Congress, it appeared to us, had chosen the snail darter over the dam. The purpose and language of the statute limited the remedies available to the District Court; only an injunction could vindicate the objectives of the Act.
 
 
 22
 Weinberger v. Romero-Barcelo, 456 U.S. 305, 313-14, 102 S.Ct. 1798, 1803-04, 72 L.Ed.2d 91 (1982); see also Amoco Prod. Co. v. Village of Gambell, --- U.S. ----, 107 S.Ct. 1396, 1403 n. 9, 94 L.Ed.2d 542 (1987) (same).
 
 
 23
 Congress has established procedures to further its policy of protecting endangered species. The substantive and procedural provisions of the ESA are the means determined by Congress to assure adequate protection. Only by requiring substantial compliance with the act's procedures can we effectuate the intent of the legislature. As we stated in Thomas v. Peterson, 753 F.2d 754, 764 (9th Cir.1985):
 
 
 24
 If a project is allowed to proceed without substantial compliance with those procedural requirements, there can be no assurance that a violation of the ESA's substantive provisions will not result. The latter, of course, is impermissible. See TVA v. Hill, 437 U.S. 153 [98 S.Ct. 2279].
 
 
 25
 We conclude that the Sierra Club is entitled to injunctive relief if the COE violated a substantive or procedural provision of the ESA by allowing construction to continue in the face of the County's failure to transfer the mitigation lands or by refusing to reinitiate consultation with the FWS. See Thomas, 753 F.2d at 763-65.
 
 
 26
 The Ninth Circuit has applied this same test when plaintiffs have alleged violations of other environmental statutes. Save Our Ecosystems v. Clark, 747 F.2d 1240, 1250 (9th Cir.1984) (NEPA); People of Village of Gambell v. Hodel, 774 F.2d 1414, 1422-26 (9th Cir.1985) (Alaska National Interest Lands Conservation Act (ANILCA)). The Supreme Court recently reversed People of Village of Gambell.[11] Village of Gambell, 107 S.Ct. 1396. It held that the equitable discretion of courts is not foreclosed absent a clear statement of congressional intent to do so. Id. at 1402-03. The federal defendants suggest that Village of Gambell, in addition to explicitly reversing the Ninth Circuit's decision in that case, also implicitly overrules Thomas. We conclude the opposite: Village of Gambell appears implicitly to affirm Thomas. In holding that courts retain their equitable jurisdiction under the ANILCA and the FWPCA, the Court carefully distinguished the language of these statutes with that found in the ESA. Village of Gambell, 107 S.Ct. at 1403 n. 9; Romero-Barcelo, 456 U.S. at 313-14, 102 S.Ct. at 1803-04.
 
 III. Substantive Violation of the Act
 
 27
 Agency decisions are reviewed under the Administrative Procedure Act, 5 U.S.C. Sec. 706(2)(A), and should be set aside only if the decision is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. Village of False Pass v. Clark, 733 F.2d 605, 609-10 (9th Cir.1984). Nevertheless, section 7(a)(2) imposes a rigorous duty on the COE:
 
 
 28
 Each Federal agency shall, in consultation with and with the assistance of the Secretary, insure that any action authorized, funded, or carried out by such agency (hereinafter in this section referred to as an "agency action") is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of [critical] habitat of such species....
 
 
 29
 16 U.S.C. Sec. 1536(a)(2) (1982) (emphasis added).
 
 
 30
 The COE contends that it was not required to halt construction after the County failed to transfer the mitigation lands. It reasons that neither the FWS nor the Sierra Club has shown (1) that the COE is not likely to acquire the mitigation lands or (2) that the conditions of the escrow agreement between Santa Fe and the County are enforceable. The district court held that Sierra Club was not likely to succeed on the merits of its claims because "positive management action [of the mitigation lands] could be postponed for another year" without jeopardizing the birds. These statements indicate a misunderstanding of the obligation section 7(a)(2) imposes on federal agencies.
 
 
 31
 The FWS concluded that, along with the other modifications to the project, 188 acres of marshland under the control and management of a public agency were the minimum necessary to mitigate the direct and indirect effects of the project. In essence, the government traded the 44 acres of marshland habitat to be destroyed by construction of a flood control channel for the transfer of 188 acres from private ownership to a publicly owned wildlife refuge. Presently, construction will destroy these 44 acres of habitat and adversely modify others. The 188 acres remain under private control and subject to easements that both the COE and the FWS concede would eliminate their value as a refuge. Santa Fe, the County, and Chula Vista have indicated their intention to increase the use of at least one of the easements. The COE asserts it has no obligation to halt construction until the Sierra Club or the County establishes that the COE will more likely than not lose its cross claim against the County. The COE's actions fall far below insuring that the project is not likely to jeopardize the continued existence of the birds. The district court erred in looking only at the potential for harm to the mitigation lands, ignoring the project's present effects on other areas of the birds' habitat. At present, construction is eliminating some of that habitat. The COE is allowing the project's adverse effects to accumulate without implementing the mitigation measures or making certain they will occur. The COE is relying on the district court resolving the issue of the disputed easements in its favor. "This reliance on the proposed actions of [others] does not satisfy the [COE]'s burden of insuring that its actions will not jeopardize the continued existence of the [endangered species]." National Wildlife Fed'n v. Coleman, 529 F.2d 359, 374 (5th Cir.), cert. denied, 429 U.S. 979, 97 S.Ct. 489, 50 L.Ed.2d 587 (1976). Moreover, we note that the COE took no legal action to force the County to transfer the mitigation lands until almost one year after the deadline for performance had passed, and not until the Sierra Club sued the COE.
 
 
 32
 The COE assures us it will prevail on the cross claim. The County, Santa Fe, and Chula Vista, however, are equally adamant in their claim that there was an implied reservation of all the easements because of their inclusion in the development plans for Gunpowder Point since 1974. They claim several of the easements are implied of necessity without which there would be a taking of Gunpowder Point. The Section 221 Agreement's discussion of the County's obligation to transfer the mitigation lands can best be described as "terse".[12] The cross claim is not before us and we express no opinion on its merits. Nevertheless, the risk that the COE might not prevail must be borne by the project, not by the endangered species. Similarly, any delay caused by the County's breach must be of construction, not of mitigation. Congress clearly intended that the COE give "the highest of priorities" and the "benefit of the doubt" to preserving endangered species such as the tern and the rail. TVA v. Hill, 437 U.S. at 174, 98 S.Ct. at 2292; H.R.Conf.Rep. No. 697, 96th Cong., 1st Sess. 12 (1979), reprinted in 1979 U.S.Code Cong. & Admin.News 2572, 2576 (conference committee's explanation of Pub.L. No. 96-159, 93 Stat. 1226, the 1979 amendments to the ESA).
 
 
 33
 Initially, the COE complied with the act by entering into the Section 221 Agreement so as to insure that the project was not likely to jeopardize the endangered species. That insurance lapsed, however, when the COE learned that its expectations under the agreement were not being fulfilled. We hold that the COE is in violation of section 7(a)(2) by allowing destruction or adverse modification of any part of the birds' habitat without first insuring the acquisition and preservation of the mitigation lands.[13]
 
 IV. Procedural Violation of the Act
 
 34
 The dispute here is actually between the federal agencies. The COE declined the FWS's request to reinitiate the consultation process. The ESA does not give the FWS the power to order other agencies to comply with its requests or to veto their decisions. National Wildlife Fed'n, 529 F.2d at 371-72; see also 51 Fed.Reg. 19,956 (1986). Section 7 imposes a duty of consultation, however, on all federal agencies. 16 U.S.C. Sec. 1536(a)(2); see also 50 C.F.R. Secs. 402.14, 402.16. Accordingly, we must determine whether the COE abused its discretion or acted arbitrarily, capriciously, or otherwise not in accordance with law by refusing to reinitiate consultation.
 
 
 35
 The Sierra Club asserts the same reasons the FWS did in arguing that the COE is required to resume consultation with the service: (1) the County has failed to transfer the mitigation lands; (2) the disputed easements decrease or eliminate the lands' value as habitat; and (3) the California Coastal Commission has approved private development of Gunpowder Point at a level greater than anticipated when the FWS issued its biological opinions. The district court relied primarily on the balance of hardships test in denying the injunction. The act does not permit courts to consider the hardship an injunction may impose on the project if endangered species' habitat is likely to be destroyed. In addition, the court noted that the private development and the escrow conditions were not reasonably certain to occur. As we discuss below in considering the COE's contentions, this is not the correct test under the statute and the regulations promulgated under it for determining whether an agency must reinitiate consultation.
 
 
 36
 The test for resumption of consultation with the FWS that pertains here is set out in 50 C.F.R. Sec. 402.16(b).[14]
 
 
 37
 Reinitiation of formal consultation is required and shall be requested by the Federal agency or by the Service, where discretionary Federal involvement or control over the action has been retained or is authorized by law and:
 
 
 38
 (a) ... ;
 
 
 39
 (b) If new information reveals effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered....
 
 
 40
 Id. (emphasis added). The regulations define "effects of the action" as the project's immediate impacts on the species ("direct effects") and those impacts that are reasonably certain to occur in the future ("indirect effects"). They also include the effects of any "other activities that are interrelated or interdependent with" the project. 50 C.F.R. Sec. 402.02.[15] The test for interrelatedness or interdependentness is "but for" causation: but for the federal project, these activities would not occur. 51 Fed.Reg. 19,932 (1986). The private projects on Gunpowder Point and D Street Fill are not part of the federal project and are not related to it or dependent on it. Thus, this development cannot trigger reinitiation, whatever its effects. The effects of unrelated private or state activities that are reasonably certain to occur are "cumulative effects." 50 C.F.R. Sec. 402.02.[16] As defined in the regulations, "effects of the action" does not include "cumulative effects." If consultation is reinitiated, however, the FWS and the COE must consider both cumulative effects and effects of the action in evaluating the threat to the birds. 50 C.F.R. Sec. 402.14(g); see also 51 Fed.Reg. 19,933 (1986).
 
 
 41
 The Sierra Club's argument that the COE did not act in accordance with the law when it refused the FWS's request therefore depends on whether the County's failure to transfer the mitigation lands and the dispute over the easements trigger reinitiation of consultation under section 402.16(b). The dispute as to the easements and the County's breach of the Section 221 Agreement are certainly "new information" that neither the FWS nor the COE took into account during previous consultations. The COE argues that it is not yet "reasonably certain" that the government will not obtain the lands free of the easements. The "reasonably certain to occur" standard applies to "[i]ndirect effects ... caused by the proposed action." 50 C.F.R. Sec. 402.02. Acquiring and preserving the mitigation lands is not an indirect effect of the action, but one of several "reasonable and prudent alternatives" that the FWS found necessary to minimize the project's effects. 16 U.S.C. Sec. 1536(b)(3)(A); see also 50 C.F.R. Sec. 402.02.
 
 
 42
 Moreover, in looking to whether it is reasonably certain that the government will not obtain the mitigation lands free of the easements, the COE has reversed the regulation's requirements. The FWS issued its last biological opinion with the assumption that the County would transfer the 188 acres without the seven easements. This is not a question of whether some effect is reasonably certain to occur. Two events definitely have occurred: the County has failed to transfer the land and it has entered into an escrow agreement conditioned on the reservation of seven easements. Nor is there any dispute between the COE and the FWS that the project will jeopardize the continued existence of the birds unless unencumbered title to the mitigation lands is obtained. The area of speculation concerns the probability of overcoming these unanticipated obstacles, i.e. whether the COE will prevail on its cross claim. This is the exact situation envisioned by the requirements for reinitiation of consultation between agencies found in section 402.16(b).
 
 
 43
 Thus, the "reasonably certain" standard does not apply and the COE should not wait until it is reasonably certain to lose its cross claim against the County before reinitiating consultation. Nor should a district court wait until mitigation efforts "never come to pass" before ordering the COE to consult with the FWS about reasonable alternatives. Translating section 402.16(b) into the language of this case, we conclude that the COE violated the regulation by failing to reinitiate consultation after learning ("new information reveals") that the destruction and modification of marshland by the project ("effects of the action") could harm the clapper rail and the least tern ("may affect the listed species") because the anticipated mitigation efforts have been delayed and may not take place at all ("in a manner or to an extent not previously considered"). The FWS reached the same conclusion. It is primarily responsible for protecting endangered species and it drafted the regulations at issue here. In holding as we do, we defer to the agency with the more appropriate expertise. See FEC v. Democratic Senatorial Campaign Comm., 454 U.S. 27, 31-32, 102 S.Ct. 38, 41-42, 70 L.Ed.2d 23 (1981); Bowles v. Seminole Rock & Sand Co., 325 U.S. 410, 413-14, 65 S.Ct. 1215, 1217, 89 L.Ed. 1700 (1945); Sierra Club v. Clark, 756 F.2d 686, 690 (9th Cir.1985); Southern Mutual Help Ass'n, Inc. v. Califano, 574 F.2d 518, 526 (D.C.Cir.1977).
 
 
 44
 We do not hold that every modification of or uncertainty in a complex and lengthy project requires the action agency to stop and reinitiate consultation. The circumstances here go far beyond the problems and doubts associated with any large endeavor. The creation and management of a refuge for the birds is the most important of many modifications the FWS considered absolutely necessary to insure that the project was not likely to jeopardize their continued existence. The land for this refuge should have been acquired more than one year ago. It is still in private hands and subject to an escrow with conditions that the COE concedes would diminish or eliminate its value as a preserve. In the cross claim, the federal defendants face parties with substantial resources and claims that we cannot say are frivolous. The institutionalized caution mandated by section 7 of the ESA requires the COE to halt all construction that may adversely affect the habitat until it insures the acquisition of the mitigation lands or modifies the project accordingly. We are aware that our decision may delay the public's enjoyment of the project's benefits and may significantly increase the costs. We note, however, that the contract requires a moratorium on construction during the tern's breeding period from May to August. Depending on the promptness and outcome of the consultation, there may be little, if any, delay. We conclude, however, that regardless of any consequences of delay, the ESA requires this result.
 
 V. Relief
 
 45
 The Sierra Club asks us to enjoin all work on the combined project until the County transfers the mitigation lands and the COE completes a new consultation with the FWS. The federal defendants suggest that any injunction should be limited to a prohibition of construction west of I-5, the location of the birds' habitat. We conclude that this is appropriate relief for the COE's substantive violation. It will prevent further loss or adverse modification of habitat while the district court resolves the cross claim for the mitigation lands.
 
 
 46
 The appropriate relief for the COE's procedural violation presents a more difficult problem. The process of assessing the project's effects, consulting with the FWS on ways to avoid these effects, and issuing a biological opinion with reasonable and prudent alternatives exists to ensure that agency actions will not jeopardize endangered species. Thomas, 753 F.2d at 764. Congress intended that the consultation process would operate so as to prevent substantive violations of the act. See H.R.Conf.Rep. No. 1804, 95th Cong., 2d Sess. 18-19, reprinted in 1978 U.S.Code Cong. & Admin.News 9453, 9484, 9486. To this end, section 7 contains a statutory prohibition against "any irreversible or irretrievable commitment of resources ... which has the effect of foreclosing the formulation or implementation of any reasonable and prudent alternative measures" during the consultation process. 16 U.S.C. Sec. 1536(d). This proscription continues until the agency conforms its project to the requirements of section 7(a)(2), 16 U.S.C. Sec. 1536(a)(2). See North Slope Borough v. Andrus, 642 F.2d 589, 611 n. 143 (D.C.Cir.1980); Conservation Law Found., Inc. v. Andrus, 623 F.2d 712, 714 n. 1 (1st Cir.1979); see also 50 C.F.R. Sec. 402.14(1); 51 Fed.Reg. 19,940 (1986). Irreversible and irretrievable commitments to this project that foreclose the implementation of alternative measures may not be restricted to the area west of I-5. There is some possibility--how large or small we cannot say--that the COE may lose its cross claim. If it does, the project may need significant modifications. We hold that the Sierra Club is entitled to an injunction against all work unless the COE reinitiates consultation within thirty days of the issuance of the mandate in this appeal, with the injunction continuing until such time as consultation is reinitiated. When consultation is reinitiated, the statutory prohibition of section 7(d) will apply.
 
 CONCLUSION
 
 47
 We conclude that the statute dictates that if an agency plans to mitigate its project's adverse effects on an endangered species by acquiring habitat and creating a refuge, it must insure the creation of that refuge before it permits destruction or adverse modification of other habitat. The Sierra Club is entitled to (1) an injunction against any work west of I-5 until the federal defendant's cross claim is resolved, (2) a declaration that the COE violated the ESA by refusing to reinitiate consultation, and (3) an injunction against all work on the project unless the COE reinitiates consultation within thirty days of the issuance of the mandate in this appeal, with the injunction continuing until such time as consultation is reinitiated. We reverse the district court's order and remand the case for trial of the cross claim and entry of an order consistent with this opinion.
 
 
 48
 The Sierra Club's request for attorneys' fees under the Equal Access to Justice Act, 28 U.S.C. Sec. 2412(d) (Supp. III 1985), is denied because we cannot state that the government's position was not substantially justified. See Minor v. United States, 797 F.2d 738, 739 (9th Cir.1986); Rawlings v. Heckler, 725 F.2d 1192, 1196 (9th Cir.1984).
 
 
 49
 REVERSED and REMANDED.
 
 
 
 [1]
 See Pub.L. No. 93-205, 87 Stat. 884 (1973)
 
 
 [2]
 The construction of the highway will eliminate about 10 acres of wetlands. A temporary detour of I-5 occupies another 7 acres at present. Caltrans will restore these 7 acres to marshland when the detour is eliminated
 
 
 [3]
 Of the remainder, 113 acres are habitat and 31 acres will serve as buffer. The total area of 188 acres was estimated from aerial photographs. When the mitigation lands were surveyed, their area actually measured 178 acres. The parties do not dispute the boundaries or extent of the mitigation lands, but simply use the figure of 188 acres so that their documents' references to the mitigation lands are consistent. We do the same
 In addition to these 178 acres, Caltrans has agreed to acquire 10.6 acres of D Street Fill as a nesting area for the term, to restore 25 acres of degraded marshland, and to convert 9.6 acres of fastland to marsh. Thus, the project's planned acquisitions total approximately 223 acres of wetlands.
 
 
 [4]
 The National Environmental Policy Act, 42 U.S.C. Secs. 4321-4370a (1982 & Supp. III 1985) (NEPA), requires agencies to develop an environmental impact statement for "major Federal actions significantly affecting the quality of the human environment." Id. at Sec. 4332(2)(C). The Coastal Zone Management Act, 16 U.S.C. Secs. 1451-1464 (1982), encourages states to develop management programs regulating development in coastal areas. Id. at Secs. 1452-1455. California has developed a program, entitled the California Coastal Act. Cal. Pub. Res. Code Secs. 30000-30900 (West 1986 & Supp.1987). Federal agencies that undertake projects within the coastal zone must insure that the projects are consistent with the state's program "to the maximum extent practicable." 16 U.S.C. Sec. 1456(c). The COE issued its "Determination of Consistency with the California Coastal Act" to comply with section 1456(c)(3)(A)
 
 
 [5]
 Section 221 of the Flood Control Act of 1970, Pub.L. No. 91-611, 84 Stat. 1824, requires each local sponsor to agree in writing that it will "furnish its required cooperation for the project." Id. at Sec. 221(a), 84 Stat. at 1831 (codified at 42 U.S.C. Sec. 1962d-5b(a) (1982))
 
 
 [6]
 The escrow agreement between the County, Chula Vista, and Santa Fe contains the following paragraphs:
 
 
 [7]
 1 Owner's Grant Deed conveying the Flood Control Property shall be placed in Escrow at such time as the specific area to be conveyed is agreed upon, in substantially the form as shown in Exhibit 2, and containing the reservations or Grants of Easement as shown thereon. It is also acknowledged and agreed that the final boundary of the Property for the Flood Control Project shall be subject to final adjustment
 ....
 
 
 [7]
 4 Owner/Optionee shall obtain, prior to the close of Escrow, all necessary permits as required by Section 404 of the Clean Water Act of 1977, as amended, as well as any other permits that may be required from any Federal agencies, to allow the construction of the Owner's/Optionee's Chula Vista Mid-Bay Front Project and, in addition, that may be required to allow the construction of the City of Chula Vista's access road to the Gunpowder Point
 The following easements are set out in Exhibit 2 of the escrow agreement:
 
 
 [1]
 Access Easement on South Levee Road to Gunpowder Point for Approved Commercial, Recreational, Nature Interpretive Center and Related Vehicle and Pedestrian Uses
 
 
 [2]
 Access Easement on North Levee Road to Gunpowder Point for Emergency Uses
 
 
 [3]
 Easement Across Entire Wetlands Complex for Habitat Maintenance, Restoration and Enhancement Consistent with the Chula Vista Local Coastal Plan
 
 
 [4]
 Access Easement on Tidelands Avenue Crossing of Sweetwater Marsh, as Shown in Chula Vista Local Coastal Plan
 
 
 [5]
 Access Easements for Route 54 Ramps for "D" Street Fill. As Approved by California Coastal Commission
 
 
 [6]
 A permanent and non-exclusive easment and right-of-way over, under, upon and across the Upland 50' of Wetlands Buffers as shown in Approved Local Coastal Plan for ingress, egress and Access over, upon and under all of such property; for construction, reconstruction, maintenance, repair, replacement, and use of streets, utility lines, pipes, drainage structures, pedestrian walkways and bicycle paths, and other installations of every sort; for grading, removal, replacement, importation, and treatment of soil and rock; for access to structures and the construction, reconstruction, maintenance, repair, replacement and use thereof; and for all other purposes necessary or incidental to the development of Grantor's Chula Vista Bay Front Project and each and every part thereof, together with the right to grant the same, or any part thereof, to others
 
 
 [7]
 Access Easement for Improvement, Maintenance and Use of Kelp Boat Basin on Gunpowder Point Including for Recreational Boating Use
 
 
 [7]
 Gunpowder Point is a headland surrounded by marshes to the north and east and San Diego Bay to the south and west. The only access by land is across the wetlands
 
 
 [8]
 D Street Fill is north of Gunpowder Point and the Sweetwater Marsh. Formerly wetlands, the area was filled with dredge spoils and is now fastland. Terns have nested on a portion of this area since 1973
 
 
 [9]
 The federal defendants suggest that this court lacks jurisdiction unless the district court's conclusion that the project poses no immediate threat to the endangered species is clearly erroneous. This suggestion is fatuous. We cannot determine whether the district court's conclusion was correct unless we have the jurisdiction to review it. Appellate jurisdiction cannot rest on the merits of the appeal itself
 The case cited in support of this suggestion, Carson v. American Brands, Inc., 450 U.S. 79, 84, 101 S.Ct. 993, 996, 67 L.Ed.2d 59 (1981), provides none. The quoted language comes from the Court's discussion of cases in which a party's motion for summary judgment included a request for a permanent injunction. The Court pointed out that the denial of summary judgment is not immediately appealable simply because the relief requested is a permanent injunction. It distinguished these cases from those where a party sought a preliminary injunction, noting that the justification for the latter is the possibility of irreparable harm pendente lite. Id. at 85, 101 S.Ct. at 997. The denial of a preliminary injunction is appealable as a matter of right. 28 U.S.C. Sec. 1292(a)(1).
 
 
 [10]
 Congress has amended section 7 three times since 1973. Pub.L. No. 95-632, Sec. 3, 92 Stat. 3751, 3752-60 (1978); Pub.L. No. 96-159, Sec. 4, 93 Stat. 1225, 1226-28 (1979); Pub.L. No. 97-304, Sec. 4, 96 Stat. 1411, 1417-20 (1982). The obligation of federal agencies now is to "insure that any action ... is not likely to jeopardize the continued existence of any endangered species," and is found in section 7(a)(2). 93 Stat. at 1226, codified at 16 U.S.C. Sec. 1536(a)(2) (1982) (emphasis added). In the 1978 amendments, Congress prohibited agencies from making "any irreversible or irretrievable commitment of resources" during consultation "which has the effect of foreclosing the formulation or implementation of any reasonable and prudent alternative measures." 92 Stat. at 3753, codified at 16 U.S.C. Sec. 1536(d). These amendments also created a procedure whereby agencies could seek exemptions for projects unable to conform with section 7(a)(2) and meeting several stringent criteria. Id. at 3753-60, codified at 16 U.S.C. Sec. 1536(e)-(p). We find it significant that Congress gave the power to grant exemptions to the Endangered Species Committee, not to the courts. See 16 U.S.C. Sec. 1536(e) & (g). The 1979 amendments sought to clarify the exemption process. 93 Stat. at 1227-28; see also H.R.Conf.Rep. No. 697, 96th Cong., 1st Sess. 14-15, reprinted in 1979 U.S.Code Cong. & Admin.News 2557, 2572, 2578-79. Congress again altered section 7 in 1982 in order to shorten and improve the consultation process. 96 Stat. at 1417-20; see also H.R.Conf.Rep. No. 835, 97th Cong., 2d Sess. 25-28, reprinted in 1982 U.S. Code Cong. & Admin.News 2807, 2860, 2866-69. We find that these amendments do not diminish the precedential force of the Supreme Court's decision in TVA v. Hill
 
 
 [11]
 The Supreme Court summarized our circuit's test for preliminary injunctions when a violation of an environmental statute is alleged:
 Relying on its earlier decision in Save Our Ecosystems v. Clark, 747 F.2d 1240, 1250 (1984), the court stated: " 'Irreparable damage is presumed when an agency fails to evaluate thoroughly the environmental impact of a proposed action.' " 774 F.2d, at 1423. It ruled that "injunctive relief is the appropriate remedy for a violation of an environmental statute absent rare or unusual circumstances." Ibid. "Unusual circumstances" are those in which an injunction would interfere with a long-term contractual relationship, Forelaws on Board v. Johnson, 743 F.2d 677 (CA9 1984), or would result in irreparable harm to the environment, American Motorcyclist Assn. v. Watt, 714 F.2d 962, 966 (CA9 1983). 774 F.2d, at 1423-25. The court found no such circumstances in the instant case.
 
 
 [107]
 S.Ct. at 1402 (emphasis supplied by the Court)
 
 
 [12]
 Two paragraphs of the Section 221 Agreement address the County's obligation to transfer the mitigation lands:
 a. Provide, without cost to the United States, all lands, easements, and rights-of-way necessary for the construction of the Project, including lands necessary for preservation of endangered species and mitigation for project effects. The minimum real estate interests to be acquired by the County are fee title or permanent easements, for levees, walls and other permanent structures; and adequate access thereto.
 ....
 g. Transfer title, in perpetuity, of all preservation and mitigation land (188 acres, subject to actual survey) within one year of the date of the signing of this agreement, to the U.S. Fish and Wildlife Service, to the California Department of Fish and Game or to another public agency approved by the Contracting Officer for preservation in public trust.
 
 
 [13]
 Even if we had applied the traditional test for preliminary injunctions, we would hold that the district court clearly erred in balancing the hardships to the respective parties. The court only examined the project's effects on the mitigation lands, ignoring its effects on other areas the birds now use as habitat. The flood control channel is scheduled for completion between November 1987 and July 1988. The court failed to discuss the possible consequences to the rail and tern if the COE's cross claim failed to acquire unencumbered title to the 188 acres, the COE's chances of prevailing, how long trial of that claim would take, or the plans of the County, Chula Vista, and Santa Fe to increase the use of at least one of the disputed easements in the mitigation lands. Once habitat is destroyed and the channel is in place, the harm to the species would be irreparable if the COE does not prevail on its cross claim. "Environmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, i.e., irreparable. If such injury is sufficiently likely, therefore, the balance of harms will usually favor the issuance of an injunction to protect the environment." Village of Gambell, 107 S.Ct. at 1404. It is certain that this project will harm the birds' environment; what is uncertain is whether the harm will be mitigated
 We are aware of the difficult decision that faced the district court: "If the court grants the injunction, the combined projects, twenty years in the planning, come to a grinding halt." Although we do not denigrate the court's concern with the expense and inconvenience to the public an injunction would cause, Congress has decided that these losses cannot equal the potential loss from extinction.
 It may seem curious to some that the survival of a relatively small number of three-inch fish among all the countless millions of species extant would require the permanent halting of a virtually completed dam for which Congress has expended more than $100 million. The paradox is not minimized by the fact that Congress continued to appropriate large sums of public money for the project, even after congressional Appropriations Committees were apprised of its apparent impact upon the survival of the snail darter. We conclude, however, that the explicit provisions of the Endangered Species Act require precisely that result.
 TVA v. Hill, 437 U.S. at 172-73, 98 S.Ct. at 2290-91.
 
 
 [14]
 The Sierra Club argues that section 402.16(c) also applies:
 (c) If the identified action is subsequently modified in a manner that causes an effect to the listed species or critical habitat that was not considered in the biological opinion....
 It does not allege, however, that the COE has modified the project.
 
 
 [15]
 "Effects of the action " refers to the direct and indirect effects of an action on the species or critical habitat, together with the effects of other activities that are interrelated or interdependent with that action, that will be added to the environmental baseline. The environmental baseline includes the past and present impacts of all Federal, State, or private actions and other human activities in the action area, the anticipated impacts of all proposed Federal projects in the action area that have already undergone formal or early section 7 consultation, and the impact of State or private actions which are contemporaneous with the consultation in process. Indirect effects are those that are caused by the proposed action and are later in time, but still are reasonably certain to occur. Interrelated actions are those that are part of a larger action and depend on the larger action for their justification. Interdependent actions are those that have no independent utility apart from the action under consideration
 
 
 [50]
 C.F.R. Sec. 402.02
 
 
 [16]
 "Cumulative effects " are those effects of future State or private activities, not involving Federal activities, that are reasonably certain to occur within the action area of the Federal action subject to consultation
 
 
 [50]
 C.F.R. Sec. 402.02