**KENTUCKY HEARTWOOD, INC., et al., Plaintiffs,**

v.

**Benjamin WORTHINGTON, et al., Defendants.**

**No. CIV. A. 00–401.**

United States District Court, E.D. Kentucky, at Lexington.

Oct. 16, 2000.

Jeffrey Brent Austin, Austin & Ward, Lexington, KY, Joe F. Childers, Lexington, KY, for Kentucky Heartwood, Inc., Heartwood, Inc., plaintiffs.

Jane E. Graham, Jane Durkin Samuel, Mason Moore Kessinger, U.S. Attorney's Office, EDKY, Lexington, KY, for United States Forest Service, Department of Agriculture, defendants.

## *OPINION AND ORDER*

FORESTER, District Judge.

## I. INTRODUCTION

This matter is before the Court on Plaintiffs' motion for a temporary restraining order. On October 10, 2000, by agreement of the parties, this Court heard consolidated arguments for this motion and for an identical motion in *Kentucky Heartwood, Inc. et. al. v. Worthington, et. al.,* 97–378 (hereinafter "Heartwood I"). Both parties briefed the issue and the court conducted a full hearing, therefore, the parties agreed to consider this a motion for preliminary injunction rather than a motion for a temporary restraining order.

## II. FACTUAL AND PROCEDURAL BACKGROUND [1]

On August 31, 1999, this Court granted an Agreed Order Dismissing as Settled Heartwood I, the predecessor to this case. The Order outlined several terms and conditions limiting timber sales in the Daniel Boone National Forest to which the parties were required to abide. On July 31, 2000, Federal Defendants' submitted to this Court a Notice of Satisfaction of Agreed Order Dismissing as Settled. The Notice stated in part that Forest Supervisor Worthington for the Daniel Boone National Forest ("Forest") had issued a Decision Notice amending the Forest Plan as required by the settlement order. The Notice also stated that, in compliance with the settlement order, the Forest Service had completed Endangered Species Act consultation regarding the amended Forest Plan with the U.S. Fish and Wildlife Service. Concurrently, from the summer of 1998 until mid September of 2000, the Forest Service has been working toward implementation of a salvage harvest in Daniel Boone National Forest due to several storms in the Forest during the first half of 1998.

On August 22, 2000, Forest Supervisor Worthington directed a memorandum to Regional Forester Estill of the Southern Region, renewing an August 18, 1998 request of her to seek an emergency declaration by the Chief of the Forest Service along with an exemption from stay of implementation for the commercial salvage of damaged trees. The Forest Service had identified approximately 122 storm damaged areas for the emergency request in the Daniel Boone National Forest. The storm damaged areas covered approximately 3,100 acres. According to the Errata Sheet of the Final Environmental Impact Statement ("EIS") for the salvage harvest, 47 of the 122 storm damaged areas were in critical need of treatment due to the threat from catastrophic wildfire to

---

1. In the interest of judicial economy, this section was reproduced substantially in Heart-wood I, a related Opinion and Order issued on this day.

private property or threatened and endangered species. Under the Alternative selected for the salvage harvest, 16 of the 122 storm damaged areas fell within the Rock Creek River corridor.[2] Finally, according to Worthington's renewed request for an emergency exemption, 21 of the 122 storm damaged areas posed a potential threat to privately owned lands containing various structures and developments.

During the following week, Forest Supervisor Worthington narrowed his requested emergency exemption from stay of implementation to 20 of the 122 total storm damaged areas. This narrowed request was forwarded to the Chief of the Forest Service on August 31, 2000. The 20 storm damaged areas for which the Forest Service requested emergency exemption encompass approximately 718 acres. The Forest Service included 12 of the original 47 critical areas in the emergency proposal. In addition, 12 of the original 16 areas within the Rock Creek Corridor were included in the proposed 20 emergency exempt areas. Four of the original 21 areas containing various structures and developments were included in the proposed 20 emergency exempt areas. Finally, under this proposal, 18 of the 20 areas designated as emergencies would be salvaged commercially through timber sales contracts.

The day after Regional Forester Estill forwarded Supervisor Worthington's narrowed emergency exemption request for 20 storm damaged areas to the Chief of the National Forest System, an Associate Deputy Chief granted Worthington's request for emergency exemption from stay during the appeal process. Based on the Associate Deputy Chief's action not staying implementation of the salvage harvest decision regarding the 20 storm damaged areas, the Forest Service could begin harvesting trees immediately. On September 18, 2000, Forest Supervisor Worthington issued the final Record of Decision approving the Salvage Harvest Due to 1998 Storm Damage.

On September 29, 2000, plaintiffs filed a motion for a Temporary Restraining Order ("TRO") in Heartwood I to prevent the Forest Service from implementing any portion of the salvage harvest, including the 20 areas exempt from stay under the Associate Deputy Chief's action. In addition, plaintiffs moved this Court to enforce the Heartwood I settlement order. Defendants filed an opposition to plaintiffs' motions on October 10, 2000 and the Court conducted a full hearing on the same day. Also on October 10th, plaintiffs initiated a new law suit in which they seek identical TRO relief from this Court. The pending motion currently before the Court is born of this new law suit. The parties agreed to consider the initial TRO motion and the TRO motion in the new law suit as a motion for preliminary injunction because both parties fully briefed the issues and the Court conducted a full hearing. The parties also agreed to consider the October 10th hearing applicable to both the September 29th motions and the new law suit. In an Opinion and Order issued simultaneously with this one, this Court denied plaintiffs motions in 97–378 thereby leaving only the TRO/preliminary injunction at issue in this new case.

## III. ANALYSIS[3]

Plaintiffs argued a plethora of issues in their motion for a TRO including *inter alia*

2. *See* USDA Forest Service, Record of Decision for the Final Environmental Impact Statement for Salvage Harvest Due to 1998 Storm Damage, at 37. Rock Creek is a Kentucky Wild River and is a candidate for designation as a National Wild and Scenic River. *Id.* at 3. The United States Environmental Protection Agency, the Kentucky Division of Water and the Kentucky State Nature Preserves Commission object to commercial logging in the Rock Creek River Corridor.

3. Over the last several years, plaintiffs have pursued numerous motions in several law suits before this Court including an identical motion in a three-year-old case that was denied today. Based on the complaint and motion in this case, plaintiffs have satisfied the

various violations of the Endangered Species Act. Specifically, Plaintiffs allege that the Salvage Harvest Due to 1998 Storm Damage and the 20 emergency areas exempted therein will irretrievably harm the Indiana bat and the Cumberland Elktoe muscle. Plaintiffs request this Court to prohibit defendants from taking any action pursuant to the Salvage Harvest Due to 1998 Storm Damage, including any action on the 20 emergency areas as approved by the Associate Deputy Chief. Plaintiffs have not exhausted their administrative remedies regarding the salvage harvest as a whole pursuant to 36 C.F.R. § 215.7; therefore, the Court will not address plaintiffs' motion regarding the entire salvage harvest project. The Associate Deputy Chief's decision to make exempt from stay during the appeal process the 20 areas discussed above is a final agency action. The Court will address the issues regarding the 20 emergency exceptions to the stay accordingly.

■ As the moving party, plaintiffs bear the burden of establishing that the circumstances justify a preliminary injunction. *Granny Goose Foods Inc. v. Brotherhood of Teamsters*, 415 U.S. 423, 441, 94 S.Ct. 1113, 39 L.Ed.2d 435 (1974). When the ESA is involved in actions wherein injunctive relief is requested, courts are not bound to use the traditional equitable "balancing of harms" analysis. *See Tennessee Valley Authority v. Hill*, 437 U.S. 153, 98 S.Ct. 2279, 57 L.Ed.2d 117 (1978); *Sierra Club v. Marsh*, 816 F.2d 1376, 1378, 1384–85 (9th Cir.1987). Thus, to determine whether injunctive relief shall issue, rather than applying the traditional four-part test for injunctive relief, the Court must simply ascertain whether there has been a violation of the ESA. Congress provided a clear directive in enacting the ESA; halt and reverse the trend toward species extinction, whatever the cost. *Hill*, 437 U.S. at 184–86, 98 S.Ct. 2279. If the ESA has been violated, the Court must grant injunctive relief. *Id.* ("If a project is

allowed to proceed without substantial compliance with those procedural requirements, there can be no assurance that a violation of the ESA's substantive provisions will not result. The latter, of course, is impermissible").

The Administrative Procedure Act prescribes the standard and scope by which a Federal District Court is to review a challenge to a final agency action under statutes like the Endangered Species Act with no internal standard of review. In reviewing the decisions of federal defendants, this Court employs the narrow "arbitrary and capricious" standard of review. 5 U.S.C. § 702 *et seq.* Specifically, the Court must determine whether the agency acted in a manner that was "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A). We must determine whether defendants' "decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment," and therefore, was arbitrary and capricious. *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971), *abrogated on other grounds, Friends of Fiery Gizzard v. Farmers Home Admin.*, 61 F.3d 501, 506 (6th Cir.1995). The Court is not empowered to substitute its judgment for that of the agency. *Id.*

■ The Court must conclude initially whether the Associate Deputy Chief's decision to grant an emergency exception was a final agency action allowing review by this court. Final agency actions are actions which (1) "mark the consummation of the agency's decisionmaking process," and (2) "by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 178, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997) (quotations omitted). The final action must be "an identifiable action or event." *Lujan v. National Wildlife Fed'n*, 497 U.S. 871, 899, 110 S.Ct.

threshold standing requirements of concrete,

imminent injury that the Court can address.

3177, 111 L.Ed.2d 695 (1990). Upon the Associate Deputy Chief's decision, the federal defendants were free to begin timber sales in those 20 designated areas. But for her emergency grant, those sales would have been stayed through any pending appeals process regarding the salvage harvest. Therefore, this was a final agency decision defining rights and obligations and is ripe for review in this Court.

■ The second issue the Court must address is whether the Associate Deputy Chief may act on behalf of the Chief in determining whether an emergency situation exists. In plain language, 36 C.F.R. § 215.10, states that the Chief of the Forest Service is responsible for determining whether an emergency situation exists. Based on the uncontroverted language in the regulation, most would believe it reasonable to assume that only the Chief could determine whether an emergency exists. Unlike most tenets of construction, however, the Supreme Court has directed lower courts to permit the delegation of duties unless a specific limitation on that delegation authority appears elsewhere. *See e.g., Touby v. U.S.,* 500 U.S. 160, 169, 111 S.Ct. 1752, 114 L.Ed.2d 219 (1991) (discussing the Attorney General's ability to delegate under 21 U.S.C. § 871(a)). Without express language to the contrary, it appears that courts should give less deference to the express language requiring the Chief to make a determination, and more deference to the absence of language disallowing delegation. Therefore, it would be reasonable to assume that the Associate Deputy Chief could act on behalf of the Chief in implementing Forest Service policy, but in this situation the regulations may indicate otherwise.

The regulations allow certain officials in direct line of command under the Chief to take certain actions. For example, under § 215.10(d)(2) the regulations allow a "Responsible Official" to act on behalf of the FS in certain instances while under § 215.10(d) (the part in dispute in this case) the regulation requires the Chief of the Forest Service to make a determination.[4] The Responsible Official, as defined by 36 C.F.R. § 215.2, is the Forest Service line officer who has the authority and responsibility to make decisions on proposed actions subject to notice, comment and appeal under this part. The regulations go on to say:

A Forest Service Line Officer is a forest service official who serves in a direct line of command from the Chief and who has the delegated authority to make and execute decisions subject to this part. Specifically, for the purposes of this part, a FS employee who holds one of the following offices and titles: District Ranger, Deputy Forest Supervisor, Forest Supervisor, Deputy Regional Forester Regional Forester, *Associate Deputy Chief,* Deputy Chief, Associate Chief of the Forest Service, or an employee delegated the authority to act in one of these capacities.

*See id.* (emphasis added). The regulations allow the Associate Deputy Chief to act in certain situations. Those situations are defined clearly in the regulations and do not include a determination of emergency situations. More telling, and potentially more relevant given the Supreme Court mandate discussed above, is the following passage found in the Federal Register explaining 36 C.F.R. § 215(d): "The exemption from stay can be granted only by the Chief." 58 F.R. 58904, 58907.

■ Express language limiting the Chief's delegation authority does exist, but it is not found in the statute or regulation identifying the Chief as the primary actor. The regulations and the law surrounding them are inextricably unclear. While the Court does believe that the Forest Service exceeded the boundaries of their own regulations in allowing the Associate Deputy

---

4. Specifically, § 215.10(d) states, "[a] project decision in not subject to a stay if the Chief of the Forest Service determines that an emergency situation exists with respect to the decision in accordance with [specific] provisions ...."

Chief to make this determination, the Court is not willing to go out on a limb and base its decision solely on these hair-splitting distinctions. At best, the Forest Service was correct in allowing this delegation, at worst, the decision was not arbitrary and capricious.

Next, the Court turns to the final agency action itself: the Associate Deputy Chief's determination that an emergency existed in 20 of the original 22 storm damaged areas. In making a final agency decision, "the agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Manufactures Association of U.S., Inc. v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983) (quoting *Burlington Truck Lines v. U.S.*, 371 U.S. 156, 168, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962)). To do otherwise is to act arbitrarily and capriciously.

In an effort to make a determination on Plaintiffs' initial motions in Heartwood I, particularly the motion for preliminary injunction, this Court conducted a full hearing. In addition, the Court has reviewed plaintiffs' and defendants' filings consisting of nearly 1000 pages of information. To the limited extent that this hearing addressed the agency action by the Associate Deputy Chief, it was not a *de novo* review of the agency action. To the contrary, it was designed to determine what the agency had done and why they had done it, both of which are an acceptable form of arbitrary and capricious review under *Overton Park* and the APA. *See Sierra Club v. Peterson*, 185 F.3d 349, 368 (5th Cir.1999) *rehearing en Banc granted*, 204 F.3d 580 (5th Cir.2000), *vacated and remanded on separate grounds*, 2000 WL 1357508 (S.D.N.Y. Sep. 20, 2000).

■ *Based on it's review, the Court found that an extensive record existed regarding the Salvage Harvest due to 1998 Storm Damage, including two EISs and at least one biological assessment, the Associate Deputy Chief made her determination that 20 storm damaged areas required emergency action upon three letters written indirectly to her by Forest Supervisor Worthington. To the Court's knowledge, the Associate Deputy Chief was unaware of any potential environmental harm to the eco-system, the water quality, or the endangered or threatened species occupying the 20 emergency areas. This decision does not constitute a balancing of the relevant facts or a rational relationship as defined by the decisionmaker between the facts evaluated and decision reached. Accordingly, the Associate Deputy Chief's decision to declare an emergency for 20 storm damaged areas in the Daniel Boone National Forest was arbitrary and capricious.*

In this narrow holding that the agency acted arbitrarily and capriciously through the Associate Deputy Chief's decision, this Court is not telling the agency what it should have done or substituting its judgement for that of the Forest Service. To the contrary, the Court has neither the responsibility nor the desire to micro-manage the Daniel Boone National Forest. *The Court is merely directing that the Chief review the same administrative record that this Court has reviewed rather than just three letters.* Such review should easily be completed within a week. The Department of Agriculture and the Forest Service should be more than capable of exercising this management authority. Therefore, given the delicate balance between fire hazards and environmental preservation, it is with great reluctance that this Court enjoins the salvage harvest on the 20 designated emergency areas and remands the case to give the Service a chance to prepare an explanation. *See Overton Park*, 401 U.S. at 420, 91 S.Ct. 814.

Plaintiffs and federal defendants in this case have reached amiable solutions through settlement negotiations in the past. To wit, the parties entered a joint

stipulation regarding the original Hazard Tree Reduction Proposal, and have negotiated accordingly regarding various levels of tree removal, including Southern Pine Beetle timber sales contracts. Accordingly, in the interest of the Forest and the numerous individuals, private property, animals, plants and endangered species that it's management affects, this Court strongly encourages the parties in this case to entertain serious settlement negotiations during this injunction and thereafter if necessary.

## IV. CONCLUSION

Accordingly, the Court, being otherwise fully and sufficiently advised, HEREBY ORDERS that:

(1) the plaintiffs' motion for a temporary restraining order, considered as a preliminary injunction by agreement of the parties is GRANTED.

(2) the Associate Deputy Chief's emergency determination is REMANDED to the Forest Service for further consideration and explanation.

(3) this order is final and appealable and no just cause for delay exists.